**EXECUTION VERSION**

ASSET PURCHASE AGREEMENT

by and among

AMVAC CHEMICAL CORPORATION,

WILLOWOOD USA, LLC,

WILLOWOOD, LLC,

RIGHTLINE LLC

and

GREENFIELDS MARKETING LTD.

Dated as of February 26, 2019

18829421

## TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| 1. | Construction; Definitions. | 2 |
| 2. | Purchase and Sale. | 9 |
| 3. | Purchase Price/Deposit | 13 |
| 4. | Liabilities and Obligations. | 15 |
| 5. | Obtaining of Procedures and Sale Order; Closing. | 15 |
| 6. | Deliveries at Closing. | 16 |
| 7. | Representations and Warranties of the Seller Parties | 17 |
| 8. | Representations and Warranties of Buyer | 19 |
| 9. | Additional Agreements of the Parties. | 19 |
| 10. | Conditions to Buyer's Obligation to Effect Closing | 21 |
| 11. | Conditions to the Seller Parties' Obligation to Effect Closing | 22 |
| 12. | Termination; Effect of Termination. | 22 |
| 13. | Tax Allocations | 23 |
| 14. | Transfer Taxes | 24 |
| 15. | Jurisdiction | 24 |
| 16. | Miscellaneous. | 24 |

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), is dated as of February 26, 2019 by and among **(i)** Willowood USA, LLC, an Oregon limited liability company ("Willowood USA"), **(ii)** Willowood, LLC, an Oregon limited liability company ("Willowood"), **(iii)** RightLine LLC, an Oregon limited liability company ("RightLine"), **(iv)** Greenfields Marketing Ltd., a private company organized under the laws of the United Arab Emirates ("Greenfields", and collectively with Willowood USA, Willowood and RightLine, the "Seller Parties" and each a "Seller"), and AMVAC Chemical Corporation, a California corporation (and, except as otherwise provided herein, any assignee to whom Buyer's rights and obligations are transferred pursuant to Section 16(h), "Buyer").

## WITNESSETH:

WHEREAS, Willowood USA, directly and through its Subsidiaries (as defined below) (including through Willowood, RightLine and Greenfields), is engaged in the business of developing, formulating and marketing generic crop protection products for the agriculture industry in the United States and Canada, including the Transferred Products (as defined below) (the "Business");

WHEREAS, on February 26, 2019, the Seller Parties intend to file a voluntary petition for relief commencing a case (the "Chapter 11 Case") under Chapter 11 of the Bankruptcy Code (as defined below) with the United States Bankruptcy Court for the District of Colorado (the "Bankruptcy Court") (collectively, the "Petition") on or about February 27, 2019 (the "Petition Date"); and

WHEREAS, the Seller Parties desire to sell, convey, assign, transfer and deliver to Buyer certain assets used in the Business and to assign to Buyer certain executory contracts and unexpired leases relating to the Business, and Buyer desires to purchase from the Seller Parties such assets and assume such contracts and unexpired leases upon the terms and subject to the conditions of this Agreement all in the manner and subject to the terms and conditions set forth herein and in accordance with Sections 105, 363 and 365 of the Bankruptcy Code, subject to Buyer's right to assign its rights hereunder to one or more of its Affiliates in accordance with Section 16(h) (such sale and purchase of the Acquired Assets (as defined below) and such assignment and assumption of the Assumed Obligations (as defined below), the "Acquisition").

WHEREAS, the parties acknowledge and agree that the purchase by Buyer of the Acquired Assets, and the assumption by Buyer of the Assumed Obligations, are being made at arm's length and in good faith and without intent to hinder, delay or defraud creditors of the Seller Parties or any of their respective Affiliates;

WHEREAS, the execution and delivery of this Agreement and the Seller Parties' respective ability to consummate the transactions set forth in this Agreement are subject to, among other things, the entry of the Sale Order under, inter alia, Sections 363 and 365 of the Bankruptcy Code; and

WHEREAS, the parties desire to consummate the proposed transaction as promptly as practicable after the Bankruptcy Court enters the Sale Order.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants set forth herein, the parties agree as follows:

**1.    Construction; Definitions.**

(a)    Construction. For all purposes of this Agreement, except as otherwise expressly provided herein:

(i)    the terms defined in this Agreement include the plural as well as the singular;

(ii)    references to an "Article," "Section," "Schedule," "preamble," "recital," or any other subdivision are to an article, section, schedule, preamble, recital, or subdivision of this Agreement;

(iii)    all accounting terms not otherwise defined herein have the meanings assigned to them under GAAP (as defined below);

(iv)    pronouns of either gender or neuter shall include, as appropriate, the other pronoun forms;

(v)    the words "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular article, section, paragraph or other subdivision;

(vi)    the words "include," "including" and other words of similar import mean "include, without limitation" or "including, without limitation," regardless of whether any reference to "without limitation" or words of similar import is made; and

(vii)    The word "or" is not exclusive.

(b)    Definitions. The following terms will, when used in this Agreement, have the following respective meanings:

"Acquired Assets" has the meaning assigned to that term in Section 2(a).

"Acquisition" has the meaning assigned to that term in the preamble to this Agreement.

"Action" means any legal or administrative action, suit, hearing, litigation, proceeding (whether civil, criminal, administrative or judicial) or any arbitration commenced, brought, conducted or heard, including any Action by or before any Governmental Authority, arbitrator, mediator or other alternative dispute resolution provided pursuant to any collective bargaining agreement or Law, including any audit or examination, or other administrative or court action or other proceeding with respect to Taxes or Tax Returns.

"Affiliate" of a specified Person means a Person who, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person. The term "control" (including derivations thereof) means (a) the possession directly or indirectly, of the power to vote 50% or more of the Equity Securities of a Person having ordinary voting power, (b) the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of a Person, whether through the ownership of Equity Securities, by Contract or otherwise, or (c) being a director, officer, executor, trustee or fiduciary (or their equivalents) or a Person or a Person that controls such Person.

2

18829421

"Agent" means Tree Line Direct Lending, LP, as the Administrative and Collateral Agent together with any successor agent.

"Agreement" means this Asset Purchase Agreement, including all schedules hereto, as the same may be amended or supplemented from time to time in accordance with its terms.

"Alternative Transaction" means a transaction where the Seller Parties seek approval of, or the Bankruptcy Court approves, any agreement or transaction with a third party for the sale or transfer of all or any portion of the Acquired Assets, directly or indirectly, whether pursuant to a Chapter 11 plan for the Seller Parties or under Section 363(b) of the Bankruptcy Code, or otherwise enters into any transaction that is materially inconsistent with this Agreement.

"Ancillary Documents" means a bill of sale, assignment and assumption agreement, intellectual property assignment agreements, escrow agreement and each other agreement, document or instrument (other than this Agreement) executed and delivered by the parties hereto in connection with the consummation of the transactions contemplated by this Agreement.

"Assigned Contracts" means those Contracts relating to the Transferred Products or the Transferred Registrations that Buyer desires to assume and to have the Seller Parties assign, as applicable, to Buyer that are designated as "Assigned Contracts" on Schedule 1(b)(i) (or identified in a separate schedule provided by Buyer to the Seller Parties at least one Business Day prior to the Auction Date as Contracts to be included as Assigned Contracts). Assigned Contracts shall not include Contracts identified in a separate schedule provided by Buyer to the Seller Parties at least three days before the Auction Date as Contracts to be excluded from the Assigned Contracts list in Schedule 1(b)(i) notwithstanding their initial inclusion.

"Assignment and Assumption Agreement" means the Assignment and Assumption Agreement in the form attached hereto as Exhibit A to be entered into by Buyer and the applicable Seller Parties as of the Closing.

"Assumed Data Compensation Liability" has the meaning assigned to that term in Section 4(b)(vi).

"Assumed Obligations" has the meaning assigned to that term in Section 4(b).

"Auction" means an auction under Section 363 of the Bankruptcy Code scheduled by the Bankruptcy Court pursuant to the Bid Procedures Order.

"Auction Date" means the date of the Auction scheduled pursuant to the Bid Procedures Order.

"Available Cash" means all cash and cash equivalents of any of the Seller Parties and their respective Affiliates and Subsidiaries.

"Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. Section 101 et seq., commonly known as the Bankruptcy Code, as it may be amended from time to time.

"Bankruptcy Court" has the meaning assigned to that term in the preamble to this Agreement.

3

"Bid Procedures Order" means an Order of the Bankruptcy Court, pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code, that has not been stayed, vacated or stayed pending appeal: (a) authorizing and scheduling the Auction, (b) approving procedures for the submission of Qualified Bids (as defined in the Bidding Procedures), (c) approving the Breakup Fee and Expense Reimbursement, (d) authorizing payment of the Breakup Fee in the event of an Alternative Transaction; (e) scheduling a hearing to consider approval of such sale, and (f) approving the form and manner of notice of the Auction procedures and Sale Hearing, which Order shall be substantially in the form attached hereto as Exhibit B.

"Bidding Procedures" means the bidding procedures substantially in the form attached as Exhibit 1 to the Bid Procedures Order with such changes as Buyer and the Seller Parties find reasonably acceptable, to be approved by the Bankruptcy Court pursuant to the Bid Procedures Order.

"Breakup Fee" has the meaning assigned to that term in Section 12(b).

"Business" has the meaning assigned to that term in the preamble to this Agreement.

"Business Day" means any day other than a Saturday, Sunday or other day on which the Bankruptcy Court is closed.

"Buyer" has the meaning assigned to that term in the introductory paragraph to this Agreement.

"Cash Purchase Price" means an aggregate amount in cash equal to $3,000,000.

"Chapter 11 Case" has the meaning assigned to that term in the preamble to this Agreement.

"Closing" means the closing of the purchase and sale of the Acquired Assets pursuant to this Agreement.

"Closing Date" means the time and date of the Closing determined pursuant to Section 5.

"Contract" means any executory contract (as such term is used in Section 365 of the Bankruptcy Code) to which any of the Seller Parties is a party (i) as of the date hereof or (ii) which is entered into by such Seller between the date hereof and the Closing Date in accordance with Section 9(b) hereof that concerns or is related to the Business, including real and personal property leases, license agreements and agreements with employees, consultants, customers or agents.

"Credit Agreement" means that certain Credit Agreement dated as of April 20, 2016 between Willowood USA and certain of its Affiliates and Subsidiaries, the financial institutions party thereto as "Lenders" and Agent.

"Cure Amounts" has the meaning assigned to that term in Section 2(c).

"Deposit Funds" has the meaning assigned to that term in Section 3(a).

"Disclosure Schedule" means the disclosure schedule delivered by the Seller Parties to Buyer (as modified, amended and supplemented, the "Disclosure Schedule").

4

18829421

"Equity Security" means (i) any common, preferred, or other capital stock, limited liability company interest or unit, partnership, limited partnership or general partnership interest, or similar security; (ii) any warrants, options, or other rights to, directly or indirectly, acquire any security described in clause (i); (iii) any other security containing equity features or profit participation features; (iv) any security or instrument convertible or exchangeable directly or indirectly, with or without consideration, into or for any security described in clauses (i) through (iii) above or another similar security (including convertible notes); and (v) any security carrying any warrant or right to subscribe for or purchase any security described in clauses (i) through (iv) above or any similar security.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Escrow Agent" has the meaning assigned to that term in Section 3(a).

"Escrow Agreement" has the meaning assigned to that term in Section 3(a).

"Estimated Closing Transferred Inventory Value" has the meaning assigned to that term in Section 3(b)(ii).

"Excluded Assets" has the meaning assigned to that term in Section 2(b).

"Excluded Contracts" has the meaning assigned to that term in Section 2(b)(xiii).

"Expense Reimbursement" has the meaning assigned to that term in Section 12(b).

"Final Post-Closing Transferred Inventory Value" means the Post-Closing Transferred Inventory Value as deemed final, binding and conclusive in accordance with Section 3(b)(ii).

"Final Transferred Inventory Count" means the Final Transferred Inventory Count as deemed final, binding and conclusive in accordance with Section 3(b)(ii).

"GAAP" means generally accepted accounting principles in the United States, consistently applied.

"Governmental Authority" means any government or any agency, bureau, commission, court, department, official, political subdivision, tribunal or other instrumentality of any government, whether federal, state or local, domestic or foreign.

"Greenfields" has the meaning assigned to that term in the introductory paragraph to this Agreement.

"Intellectual Property" means all of the following as they exist in any jurisdictions throughout the world:

(i) patents, patent applications, industrial property rights and the inventions, conceptions, designs, reductions to practice, and improvements described and claimed therein, patentable inventions, and other patent rights (including any divisionals, continuations, continuations-in-part, renewals, substitutions or reissues thereof), whether or not patents are issued thereon and whether or not any such applications are amended modified, withdrawn or refiled;

5

(ii) trademarks, service marks, trade dress, trade names, brand names, fictitious business names, designs, logos, corporate names, or general intangibles of a similar nature (including, in each case, the goodwill associated therewith), whether registered or unregistered, and all registrations and applications for registration thereof;

(iii) copyrights in both published and unpublished works, all sui generis rights in data and databases, and any other rights of authorship in any other published and unpublished works, including all moral rights therein, as well as all copyright registrations and applications for registration thereof, including all renewals and extensions thereof, and non-registered or common law copyrights;

(iv) trade secrets, know-how, confidential information, proprietary information, and any other information that derives economic value from not being generally known to other Persons, including ideas, inventions, processes, documentation, information, data, customer lists, products, processes, technology, plans, drawings, designs, systems, specifications and other proprietary rights (whether or not patentable or subject to copyright, mask work, or trade secret protection);

(v) all Uniform Resource Locators ("URLs"), domain names, IP or Internet names or addresses, keywords or purchased search terms, web sites or web pages and related rights and items;

(vi) computer software programs and software systems, and all versions, forms and embodiments thereof, including all source code, object code, executable code, binary code, files, objects, comments, screens, user interfaces, report formats, templates, menus, buttons and icons and all data, materials, manuals, design notes and other items and documentation related thereto or associated with the foregoing; and

(vii) any manufacturing instructions, confidential statements of formula, development data, and other know-how (including complete data matrices for all products identifying studies supporting registrations) in any of the Seller Parties' possession and legal control, if any, that will enable Buyer to make, have made, formulate, have formulated, manufacture, have manufactured, and sell any and all Transferred Products, including (a) the composition listing for all Transferred Products including all components by Chemical Abstracts Service (CAS) Registry Number, (b) copies of all correspondence submitted to USEPA or state regulatory agencies to support registration of the Transferred Products in any of the Seller Parties' possession, (c) copies of Registration Data owned by any of the Seller Parties relating to the Transferred Registrations, (d) formulation process descriptions for all Transferred Products, including with respect to order of addition of, and amount of, components, mixing instructions, holding times, and temperatures, and (e) other records required by the Laws of the U.S. or individual states to be maintained by any of the Seller Parties or their respective Subsidiaries in connection with the manufacture, formulation, marketing, distribution or sales of the Transferred Products.

"Knowledge of Seller" and other phrases of like substance mean, with respect to a particular fact or other matter, the actual knowledge of Jason Urband and Joe Middione.

"Laws" means all applicable laws (including common law), statutes, rules, regulations, codes, ordinances, decrees, proclamations or any requirement of any Governmental Authority.

"Liability" has the meaning assigned to that term in Section 4(a).

18829421

"Liens" means any mortgage, lien, pledge, covenant restriction, security interest, claim, charge, title defect, interest and other encumbrance.

"Material Adverse Change" means any effects, changes, events, conditions or circumstances that, individually or in the aggregate, result in or would reasonably be expected to result in, a material adverse effect on the operations, assets, or condition (financial or otherwise), of the Acquired Assets, taken as a whole, or the ability of the Seller Parties to consummate the transactions contemplated hereby and does not include the filing of a voluntary petition under Chapter 11 of the Bankruptcy Code by the Seller Parties; *provided, however,* that in determining whether there has been a Material Adverse Change, any effects, changes, events, conditions or circumstances to the extent attributable to any of the following shall be disregarded: (a) any change in the general condition of the national or global economy; (b) the announcement of this Agreement or the transactions contemplated hereby in accordance with the terms hereof; (c) the Petition and related proceedings; and (d) the sale process of the Acquired Assets to the extent in accordance with the terms of the Bidding Procedures Order, except with respect to the foregoing clause (a), to the extent such effect, change, event, condition or circumstance has or would reasonably be expected to have a disproportionate effect on the Acquired Assets (taken as a whole) relative to other businesses operating in the industry in which the Seller Parties operate.

"Objection Notice" has the meaning assigned to that term in Section 3(b)(ii).

"Order" means any decree, injunction, judgment, order, ruling or writ of any Governmental Authority.

"Ordinary Course of Business:" an action taken by a Person will be deemed to have been taken in the Ordinary Course of Business only if that action: (i) is consistent in nature, scope and magnitude with the recent practices of the applicable Seller given such Seller's current financial constraints and is taken in the ordinary course of the normal, day-to-day operations of such Seller, and (ii) is not required to be authorized by the members, managers, partners, shareholders or board of directors, as applicable, of such Person, and does not require any other separate or special authorization of any nature.

"Outside Date" has the meaning assigned to that term in Section 12(a)(i).

"Permits" means licenses, permits, franchises, approvals, authorizations, registrations, certificates of authority, and orders, or any waiver of the foregoing, issued or issuable by any Governmental Authority.

"Permitted Liens" means (i) Liens for current Taxes not yet due, (ii) interests of any lessors (in their capacity as such) in items constituting part of the Acquired Assets which are leased by the applicable Seller from such lessor, (iii) assessments, rights of way and other similar non-monetary Liens, (iv) mechanics' and materialman's Liens for amounts not yet due and payable, but only to the extent such Liens secure Assumed Obligations or amounts accruing after the Closing under Assigned Contracts, which do not, individually or in the aggregate, materially detract from the use or value of the Acquired Assets, and (v) the Liens set forth on Schedule 1 hereto.

"Person" means any individual, corporation, partnership, limited liability company, joint venture, trust, association, unincorporated organization, other entity, or governmental body or subdivision, agency, commission or authority thereof.

7

"Petition" has the meaning assigned to that term in the preamble to this Agreement.

"Petition Date" has the meaning assigned to that term in the preamble to this Agreement.

"Post-Closing Transferred Inventory Value" has the meaning assigned to that term in Section 3(b)(ii).

"Purchase Price" means (i) the Cash Purchase Price *plus* (ii) the Transferred Inventory Value (as finally determined pursuant to Section 3(b)(ii)).

"Registration" means a permission, authorization, registration or approval from an applicable Governmental Authority that is necessary for the sale, formulation or distribution of (i) a pesticidal product containing a particular active ingredient or (ii) a technical grade active ingredient which is subsequently used in the manufacture of a formulated end-use pesticideal product, in each case, including any permission, authorization, registration or approval from an applicable Governmental Authority necessary for the sale of such product for the uses identified on the product's label.

"Registration Data" means the data, information, reports and studies relating to a particular active ingredient or its formulations which are required by a Governmental Authority to support an application for a granted or pending Registration.

"Retained Obligations" has the meaning assigned to that term in Section 4(a).

"RightLine" has the meaning assigned to that term in the introductory paragraph to this Agreement.

"Sale Hearing" means a hearing conducted by the Bankruptcy Court to consider the approval of this Agreement and the transactions contemplated hereby.

"Sale Order" means an Order from the Bankruptcy Court, in form and substance reasonably acceptable to Buyer, approving the sale to Buyer of the Acquired Assets contemplated hereby under Sections 363(b), 363(f) and 365 of the Bankruptcy Code free and clear of all Liens other than the Permitted Liens and finding, among other things, that Buyer is a good faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code.

"Seller" has the meaning assigned to that term in the introductory paragraph to this Agreement.

"Seller IP" means any Intellectual Property owned or licensed by any Seller and used exclusively in connection with the Transferred Products or the Transferred Registrations.

"Seller Parties" has the meaning assigned to that term in the introductory paragraph to this Agreement.

"Straddle Period" has the meaning assigned to that term in Section 13(b).

"Subsidiary" of any Person means another Person, an amount of the voting securities, other voting ownership or voting partnership interests of which is sufficient to elect at least a majority of its board of directors or other governing body, or, if there are no such voting interests,

50% or more of the equity interests of which is owned directly or indirectly by such first Person or by another subsidiary of such first Person.

"Tax" and "Taxes" means income, gross receipts, property, sales, use, license, excise, franchise, employment, social security, governmental pension or insurance, withholding or similar Taxes or contributions, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties.

"Tax Code" means the Internal Revenue Code of 1986, as amended.

"Tax Return" means any return, filing, report, claim, refund request, questionnaire, information statement or other document required to be filed, including any amendments that may be filed, for any taxable period with any Governmental Authority (whether or not a payment is required to be made with respect to such filing) relating primarily to Taxes.

"Transfer Taxes" means all excise, sales, use, value added, registration stamp, recording, documentary, conveyancing, franchise, property, transfer and similar Taxes, levies, charges and fees.

"Transferred Data" shall have the meaning set forth in Section 2(a)(ii).

"Transferred Inventory" has the meaning assigned to that term in Section 2(a)(iv).

"Transferred Inventory Book Value" has the meaning assigned to that term in Section 3(b)(ii).

"Transferred Inventory Count" has the meaning assigned to that term in Section 3(b)(ii).

"Transferred Products" shall mean those products listed on Schedule 1(b)(ii).

"Transferred Products Lists and Numbers" has the meaning assigned to that term in Section 2(a)(x).

"Transferred Registrations" shall have the meaning set forth in Section 2(a)(i).

"Transferred Subsidiaries" shall have the meaning set forth in Section 2(a)(viii).

"Willowood" has the meaning assigned to that term in the introductory paragraph to this Agreement.

"Willowood USA" has the meaning assigned to that term in the introductory paragraph to this Agreement.

## 2. Purchase and Sale.

(a) Acquired Assets. Subject to the terms and conditions of this Agreement, to the extent not prohibited by Law, and except as provided in Section 2(b), on the Closing Date, the Seller Parties shall sell, transfer, assign and deliver to Buyer, and Buyer shall purchase and acquire from the applicable Seller, all right, title and interest of the Seller Parties in and to the following assets (collectively, the "Acquired Assets"), free and clear of Liens other than the Permitted Liens:

9

(i)    The Registrations expressly set forth and identified on Schedule 2(a)(i) (the "Transferred Registrations");

(ii)    The Registration Data expressly set forth and identified on Schedule 2(a)(ii) (the "Transferred Data");

(iii)    All Seller IP;

(iv)    All inventories, including raw materials, work-in-progress, finished goods, and packaging for the Transferred Products (collectively, the "Transferred Inventory");

(v)    [Intentionally Omitted];

(vi)    All rights of the applicable Seller Parties under the Assigned Contracts;

(vii)    All rights of the Seller Parties under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors relating to the Transferred Inventory or Transferred Products;

(viii)    The Equity Securities of Willowood USA in the Subsidiaries listed on Schedule 2(a)(viii) (the "Transferred Subsidiaries");

(ix)    Sales records relating solely to the Transferred Products for the two-year period immediately preceding the Closing and customer lists; and

(x)    Vendor and mailing lists of the Seller Parties and existing telecopier numbers and telex numbers used by any of the Seller Parties, in each case to the extent relating solely to the Transferred Products (the "Transferred Products Lists and Numbers").

(b)    Excluded Assets. Notwithstanding anything to the contrary contained in this Agreement, the Acquired Assets do not include the following assets (collectively, the "Excluded Assets"):

(i)    All Available Cash;

(ii)    All bank accounts of the Seller Parties and their respective Affiliates and Subsidiaries;

(iii)    The corporate seals, minute books, stock record books and other corporate records having exclusively to do with the corporate organization and capitalization of each Seller;

(iv)    All Registrations that are not Transferred Registrations;

(v)    All Registration Data that is not Transferred Data;

(vi)    All Intellectual Property that is not Seller IP;

(vii)    All accounts receivable, notes receivable, security deposits, and other debts or payables due or accruing to any of the Seller Parties ("Excluded Accounts Receivable");

(viii)    All machinery, equipment, vehicles, furniture, furnishings, fixtures, operating equipment, supplies and tools, computer hardware and all parts, spares and accessories thereof and accessions thereto;

10

18829421

(ix) All inventories of the Business, including raw materials, work-in-progress, finished goods, and packaging, other than the Transferred Inventory;

(x) Except for the Transferred Products Lists and Numbers, all customer, vendor and mailing lists of the Seller Parties, and existing telephone numbers, telecopier numbers and telex numbers used by any of the Seller Parties;

(xi) All data processing systems, computer software, books, records, files, data bases, specifications, manuals and other papers and information of the Seller Parties (including any and all accounting books and records);

(xii) All stationery and other imprinted material and office supplies, and packaging and shipping materials of the Seller Parties;

(xiii) Contracts not constituting Assigned Contracts (the "Excluded Contracts");

(xiv) All Tax records of the Seller Parties and all Tax refunds to which any of the Seller Parties is or may be entitled;

(xv) All rights of the Seller Parties in respect of any insurance policies;

(xvi) Any "employee benefit plans" (within the meaning of Section 3(3) of ERISA);

(xvii) The goodwill and other intangible assets associated with the Business;

(xviii) All rights of recovery, rights of set-off, recoupment, claims and causes of action of the Seller Parties relating to the Business, whether known or unknown, including all causes of action (x) arising under Chapter 5 of the Bankruptcy Code or (y) against Willowood Ltd., Vijay Mundhra, Brian Heinze, Joseph Middione and Andy King; and

(xix) All other assets of the Seller Parties and the Business other than as set forth in Section 2(a).

(c) Assigned Contracts. At the Closing, Buyer shall acquire all right, title and interest of the applicable Seller Parties in and to all of the Assigned Contracts. Upon the written request of Buyer, the Seller Parties shall provide Buyer with a list of all amounts required, to the Knowledge of Seller, to cure all defaults under each of the Assigned Contracts designated by Buyer in such request, so as to permit the assumption and assignment of each such Assigned Contract pursuant to Section 365 of the Bankruptcy Code (the "Cure Amounts"); *provided* that, for the avoidance of doubt, (i) the Cure Amounts shall be in the amount agreed to by the applicable counterparty to such Contract or as determined by the Bankruptcy Court, and (ii) the Cure Amounts will not include the Assumed Data Compensation Liability, and, for clarity, the amount of such Assumed Data Compensation Liability will not be determined by the Bankruptcy Court. Schedule 2(c) hereto sets forth the Seller Parties' good faith estimate of the Cure Amounts for the Assigned Contracts as of February 20, 2019.

(d) Product Registrations.

(i) The Seller Parties and Buyer shall use commercially reasonable efforts to cause the Transferred Registrations to be transferred to Buyer in its, its Affiliates' or its designees' name(s) as soon as is reasonably practicable after the Closing Date in the following manner, including delivery by the applicable Seller to Buyer of transfer paperwork utilizing forms

11

published by EPA and executed by the applicable Seller within fifteen (15) days after Closing. As promptly as practicable but in any event not later than fifteen (15) days following receipt of the executed transfer paperwork, Buyer shall, or shall cause its Affiliates' or its designees' to, execute and file, or cause to be filed with the appropriate Governmental Authorities, any necessary documents to effectuate the transfer of each of the Transferred Registrations to Buyer's, its Affiliates' or its designees' name(s). Any and all fees, expenses and other costs associated with effectuating such transfers (whether internal or external, and including such fees, expenses and other costs of the Seller Parties and their respective Subsidiaries) shall be borne by Buyer, its Affiliates or its designees, and none of the Seller Parties nor their respective Affiliates shall be responsible for the payment of such fees, expenses or costs.

(ii)     Upon receipt of approvals from the appropriate Governmental Authorities regarding a transfer of a Transferred Registration, Buyer, its Affiliates and its designees shall comply with this Agreement and, in all material respects, with all Laws for changeover of all formulated Transferred Product packaging, labeling, and package inserts associated with the formulated Transferred Products that are the subject of such Transferred Registration, it being understood that, subject to the provisions of Section 2(d)(iii), for the period commencing on the Closing and ending twelve (12) months after the date of transfer of each Transferred Registration, Buyer shall be permitted to use Seller's label and the "Willowood" trademark and name in connection with the marketing, distribution and sale of subject product.

(iii)    Seller hereby grants Buyer a fully paid up, non-exclusive, non-sublicensable limited license to use the trademark "Willowood" solely for the purposes of the marketing, distribution and sale of existing Transferred Inventory packaged by Seller in its original packaging or new product packaged by Buyer post-Closing prior to the transfer of any Transferred Registration. All use by Buyer of the trademark "Willowood" in connection with new product packaged by Buyer post-Closing prior to the transfer of any Transferred Registration, shall be limited to the extent necessary to us the trademark "Willowood" in a manner consistent with labeling requirements under FIFRA. In connection with the rights conferred to Buyer under this Section 2(d)(iii), Buyer shall cease using the "Willowood" trademark and name in the production of new labels and packaging on the earlier to occur of either (x) sixty (60) days after the date of transfer of the applicable Transferred Registration or (y) one year after the Closing, it being understood that, in any event, Buyer shall be permitted to sell out its inventory of product with labels bearing Seller's name into the channels of distribution for a maximum period of eighteen months after the earlier date of either (x) or (y) described in this sentence.

(iv)     In connection with the actions contemplated by this Section 2(d), each party shall, and shall cause its Affiliates or Subsidiaries, as applicable, to, (A) provide reasonably necessary assistance to the other party, its Affiliates and its designees in seeking to have the Transferred Registrations transferred to Buyer, its Affiliates or its designees in accordance with Section 2(d)(i), (B) provide to the other party an appropriate registration manager for purposes of liaising with respect to the transfer of each Transferred Registration and (C) appoint one employee as the primary point of escalation contact for the other party with respect to such party's obligations pursuant to this Section 2(d). The Parties shall notify each other of the name and relevant contact information for such employees as soon as reasonably practicable following the Closing.

(v)      During the period of time commencing on the Closing Date and continuing until the completion of the transfer of each of the Transferred Registrations to Buyer, the Seller Parties shall, and shall cause their respective applicable Subsidiaries to, continue to be responsible for the

18829421

maintenance of each of the Transferred Registrations and related state-level Registrations at Buyer's expense. Upon completion of transfer of each such Transferred Registration, none of the Seller Parties nor any of their respective Subsidiaries shall have any obligation to support or maintain such Transferred Registration or any related state-level Registrations.

## 3. Purchase Price/Deposit

(a) Deposit Funds. Within three (3) Business Days of the entry of the Bid Procedures Order, subject to the execution of an escrow agreement reasonably acceptable to the Seller Parties and Buyer (the "Escrow Agreement"), with U.S. Bank National Association (the "Escrow Agent"), the Buyer shall deposit into escrow account with the Escrow Agent an amount equal to $1,300,000 (the "Deposit Funds"), by wire transfer of immediately available funds pursuant to the terms of the Escrow Agreement. The Deposit Funds shall be released by the Escrow Agent and delivered to either (x) Buyer or (y) the Seller Parties, as follows:

(i) if the Closing shall occur, the Deposit Funds shall be released directly to the Seller Parties and credited towards the Purchase Price payable by Buyer;

(ii) if this Agreement is terminated by the Seller Parties pursuant to Section 12(a)(ii)(C) in any circumstance where Buyer is not entitled to terminate this Agreement pursuant to Section 12(a)(i) or Section 12(a)(iii), then the Deposit Funds shall be released directly to the Seller Parties; or

(iii) if this Agreement is terminated by Buyer pursuant to Section 12(a)(i) or Section 12(a)(iii), or if this Agreement is terminated by the Seller Parties pursuant to Section 12(a)(ii)(A) or (B), or if this Agreement is terminated pursuant to Section 12(a)(iv), then the Deposit Funds shall be released directly to Buyer.

(b) Closing Payment. The aggregate purchase price for the Acquired Assets and the Assumed Obligations shall be the Purchase Price, which Buyer shall pay to the Seller Parties at the Closing by wire transfer of immediately available funds to such bank accounts and in such proportions as designated in writing by Willowood USA as follows:

(i) an amount equal to the Cash Purchase Price *less* the Deposit Funds (which will be released directly to the Seller Parties by the Escrow Agent pursuant to Section 3(a)(i) and the Escrow Agreement). At the Closing, Buyer and the Seller Parties shall deliver a joint instruction to the Escrow Agent to distribute to Seller the Deposit Funds from the escrow account. At the Closing, Buyer shall execute any documents required to release any Lien as reasonably requested by the Seller Parties;

(ii) an amount (the "Transferred Inventory Value") equal to the value of the Transferred Inventory to be calculated as the applicable Seller's book value (as determined pursuant to GAAP) of the Transferred Inventory. As of the effective date hereof, the Seller Parties have provided Buyer with a list setting forth each Transferred Product (by SKU), the most recent selling price for each such Transferred Product and such Seller's book value of each such Transferred Product. At Closing, the Seller Parties shall provide Buyer with a written statement that describes the Transferred Inventory by location, amount, type of Transferred Inventory and the Seller Parties' calculation of the Transferred Inventory Value (the "Estimated Closing Transferred Inventory Value"), which such Estimated Closing Transferred Inventory Value shall be paid to the Seller Parties at the Closing as the estimated Transferred Inventory Value. Within thirty (30) calendar days after the Closing, Buyer shall conduct a physical inventory count of the

18829421

Transferred Inventory and provide a written inventory count to the Seller Parties (the "Transferred Inventory Count") and Buyer's calculation of the Transferred Inventory Value (the "Post-Closing Transferred Inventory Value"). The Seller Parties shall have ten (10) Business Days after receipt of the Transferred Inventory Count and the Post-Closing Transferred Inventory Value to review the same. If the Seller Parties disagree with Buyer's determination of the Transferred Inventory Count or calculation of all or any portion of the Post-Closing Transferred Inventory Value, the Seller Parties may, within such ten (10) Business Day period, deliver a notice to Buyer setting forth the Seller Parties' objection to such Transferred Inventory Count or Post-Closing Transferred Inventory Value (an "Objection Notice"). If the Seller Parties timely deliver to Buyer an Objection Notice, then the parties hereto shall negotiate in good faith to reach agreement on the disputed items or amounts in order to determine a mutually-agreeable Final Transferred Inventory Count and Final Post-Closing Transferred Inventory Value, which such amounts shall be deemed final, binding, and conclusive for purposes of this Agreement. If the Seller Parties fail to deliver an Objection Notice during such ten (10) Business Day period, then the Transferred Inventory Count and Post-Closing Transferred Inventory Value as determined by Buyer and delivered to the Seller Parties in accordance with this Section 3(b)(ii) shall be deemed final, binding, and conclusive for purposes of this Agreement and shall constitute the Final Transferred Inventory Count and the Final Post-Closing Transferred Inventory Value. Within ten (10) days after the Transferred Inventory Count and Post-Closing Transferred Inventory Value becoming final, binding, and conclusive for purposes of this Agreement, the Seller Parties shall either (A) remit the difference between the Estimated Closing Transferred Inventory Value and the Final Post-Closing Transferred Inventory Value (to the extent that the former exceeds the latter) or (B) bill Buyer for the difference between the Estimated Closing Transferred Inventory Value and the Final Post-Closing Transferred Inventory Value (to the extent that the latter exceeds the former), in which case Buyer shall pay such difference to Seller within twenty (20) days of such notice.

(c)     Transferred Inventory Count. Within five (5) Business Days after issuance of the Sales Order, upon Buyer's written request, Seller shall permit Buyer to conduct a physical inventory of the Transferred Inventory at any or all locations in which it is held at such reasonable time(s) as the parties shall mutually agree; *provided,* that Buyer shall permit a representative of Seller to accompany Buyer during any such physical inventory and promptly thereafter will provide Seller with the results of such physical inventory.

(d)     Allocation of Purchase Price. Willowood USA and Buyer shall allocate the aggregate Purchase Price, the Assumed Liabilities (to the extent taxable consideration for income Tax purposes), and all other taxable consideration for U.S. federal income Tax purposes to be paid for the Acquired Assets in accordance with Section 1060 of the Tax Code. Willowood USA and Buyer shall use reasonable best efforts to agree upon such allocation and reduce it to writing as soon as practicable following the execution of this Agreement, and in any event shall agree on such allocation prior to the Closing Date, and such allocation shall be attached to this Agreement as Schedule 3(d). In addition, the Willowood USA and Buyer hereby undertake and agree to file timely any information that may be required to be filed pursuant to Treasury Regulations promulgated under Section 1060(b) of the Tax Code. Neither Willowood USA nor Buyer shall file any Tax Return or other document or otherwise take any position which is inconsistent with any allocation agreed upon by them; *provided, however,* that in the event the parties have not agreed upon an allocation, neither party shall have any obligation to treat or report the allocation of Purchase Price, the Assumed Liabilities (to the extent taxable consideration for income Tax purposes) and other taxable consideration among the Acquired Assets consistently for Tax or other reporting purposes. If any Governmental Authority disputes the allocation reflected by Willowood USA or Buyer on their respective Tax Returns, Willowood USA or Buyer, as the case may be, shall promptly notify the other party in writing of the items in dispute.

## 4. Liabilities and Obligations.

(a) Non-Assumption of Liabilities. Notwithstanding anything to the contrary contained herein and except as expressly set forth in Section 4(b), Buyer does not assume and shall have no responsibility or obligation whatsoever for any liabilities, commitments or obligations of the Seller Parties of any kind or nature whatsoever, known or unknown, accrued, fixed, contingent or otherwise, liquidated or unliquidated, choate or inchoate, due or to become due (collectively, "Liabilities"), including any liabilities or obligations in respect of any liabilities associated with any Excluded Assets (collectively, the "Retained Obligations").

(b) Assumed Obligations. At the Closing, subject to the limitation set forth in Section 4(c), Buyer shall assume only the following Liabilities and obligations (the "Assumed Obligations") of the Seller Parties:

(i) post-Petition trade payables and Liabilities incurred in the Ordinary Course of Business consistent with present practice in the Seller Parties' Chapter 11 case (excluding court-retained professionals' fees and reimbursement of the Seller Parties for court-approved amounts already paid), relating solely to the Acquired Assets in an amount not to exceed $250,000, it being understood that such payables and Liabilities shall not be duplicative with amounts reflected in the calculation of Transferred Inventory Value;

(ii) the Liabilities and obligations of the Seller Parties under the Assigned Contracts that have accrued from and after as of the Closing Date, including any Cure Amounts;

(iii) [Intentionally Omitted];

(iv) any Liabilities and obligations of the Seller Parties to Sulfur Mills for Clomazone;

(v) any Liabilities and obligations of the Seller Parties to India Pesticides Limited for Thiobencarb; and

(vi) all data compensation Liability of the Seller Parties or their respective Subsidiaries with respect to any Transferred Registration issued to or applied for by the Seller Parties or any of their respective Subsidiaries pursuant to FIFRA (or any similar state or local laws regulating pesticides), as further summarized on Schedule 4(b)(vi) (the "Assumed Data Compensation Liability"). In no event will Buyer have any obligation to pay data compensation Liability other than the Assumed Data Compensation Liability.

(c) Excluded Contracts. Buyer shall not acquire, or assume any liability for, any claims arising from any Excluded Contracts.

## 5. Obtaining of Procedures and Sale Order; Closing.

(a) Obtaining Sale Order and Bid Procedures. The Seller Parties shall use their reasonable best efforts to obtain entry of the Bid Procedures Order and the Sale Order, subject to its obligations under the Bankruptcy Code.

(b) Closing. If the Sale Order is entered, then, subject to the satisfaction or waiver by the parties of the conditions to their respective obligations to effect the Closing set forth in Sections 10 and 10(h), the Closing shall take place at the offices selected by Buyer not later than 10 Business Days

15

following the date that the Sale Order is entered, or on such other date or at such other location as Willowood USA and Buyer shall mutually agree, but in any event not later than 60 days following the date of this Agreement.

## 6. Deliveries at Closing.

(a) Deliveries by the Seller Parties. At the Closing, the Seller Parties shall deliver, or cause to be delivered (in addition to any other instruments required by Section 10 or otherwise by this Agreement to be delivered by the Seller Parties at the Closing), to Buyer the following (in form and substance reasonably satisfactory to Buyer):

(i) a duly executed bill or bills of sale and assignment or other appropriate instruments transferring all right, title and interest in and to all of the Acquired Assets to Buyer purchasing such Acquired Assets as set forth herein;

(ii) the certificates representing the Equity Securities of each of the Transferred Subsidiaries, duly endorsed in blank, and if no such certificates exist, an assignment of such Equity Securities, duly executed by Willowood USA;

(iii) a certified copy of the Sale Order;

(iv) the Transferred Data;

(v) Seller IP;

(vi) subject to Section 2(d), possession of all of the Acquired Assets;

(vii) the Assignment and Assumption Agreement, duly executed by the applicable Seller Parties;

(viii) evidence reasonably satisfactory to Buyer of compliance with the notice provisions set forth in the Bid Procedures Order and in the Sale Order;

(ix) a release of all Liens of the Seller Parties' secured lenders against both (a) the Equity Securities of, and (b) the assets of, the Transferred Subsidiaries;

(x) copies of the resolutions of the board of directors or similar authorizing Person of the Seller Parties authorizing the execution and performance by the Seller Parties of this Agreement and authorizing the officers of the applicable Seller Parties to carry out and perform the terms and provisions hereof, certified by an appropriate officer of each such Seller; and

(xi) such other instruments or documents as Buyer may reasonably request to fully effect the transfer of the Acquired Assets and to confer upon Buyer the benefits contemplated by this Agreement.

(b) Deliveries by Buyer. At the Closing, Buyer shall deliver, or cause to be delivered (in addition to any other instruments required by Section 10(h) or otherwise by this Agreement to be delivered by Buyer at the Closing), to the Seller Parties, the following:

(i) the Purchase Price payable in the manner described in Section 3;

16

18829421

(ii)    the Assignment and Assumption Agreement, duly executed by Buyer.

**7.    Representations and Warranties of the Seller Parties.** Each Seller hereby represents and warrants to Buyer as follows:

(a)    Organization; Authorization. Such Seller is duly organized, validly existing and in good standing under the Laws of the jurisdiction of incorporation or formation of such Seller and, subject to entry of the Sale Order, has the requisite organizational power and authority to execute and deliver this Agreement and the Ancillary Documents to which such Seller will be a party and to perform its obligations hereunder and thereunder. Subject to entry of the Sale Order, the execution, delivery and performance of this Agreement and the Ancillary Documents to which such Seller will be a party has been duly authorized by all necessary organizational action of such Seller. This Agreement has been duly and validly executed by such Seller and, subject to the entry of the Sale Order and the due authorization, execution and delivery of this Agreement by Buyer and the other parties hereto, constitutes a legal, valid and binding obligation of such Seller, enforceable against it in accordance with its terms. The Ancillary Documents to which such Seller will be a party will be duly and validly executed and delivered by such Seller and, assuming the due authorization, execution and delivery of such Ancillary Documents by the other parties thereto, will constitute a legal, valid and binding obligation of such Seller, enforceable against it in accordance with its terms.

(b)    No Conflict; Consents. Subject to the entry of the Sale Order and except as otherwise set forth on Section 7(b) of the Disclosure Schedule, neither the execution and delivery of this Agreement or the Ancillary Documents to which such Seller will be a party, nor the consummation of any or all of the transactions contemplated hereby or thereby, will (i) violate the certificate of incorporation or bylaws (or other governing instrument, in each case as amended, modified or supplemented) of such Seller; (ii) violate, be in conflict with or constitute a default under, or require the consent of any third party to, any Assigned Contract; or (iii) violate any Laws or Orders applicable to the Business or the Acquired Assets.

(c)    Consents and Approvals of Governmental Authorities. Other than the entry of the Sale Order by the Bankruptcy Court, no consent, approval or authorization of, or declaration, filing or registration with, any Governmental Authority is required in connection with the execution, delivery and performance of this Agreement or the Ancillary Documents, or the consummation of the transactions contemplated hereby or thereby.

(d)    Contracts. Section 7(d) of the Disclosure Schedule sets forth a list of all Contracts relating to the Transferred Products or the Transferred Registrations. In the event Buyer identifies any Contracts relating to the Transferred Products or the Transferred Registrations that are not listed on Section 7(d) of the Disclosure Schedule as executory contracts (as such term is used in Section 365 of the Bankruptcy Code), then the Seller Parties shall amend Section 7(d) of the Disclosure Schedule to include such Contracts.

(e)    Brokers; Agents. Except as set forth on Section 7(e) of the Disclosure Schedule, no investment banker, broker, finder or similar agent has been employed by or on behalf of such Seller in connection with this Agreement, and such Seller has not entered into any agreement, arrangement or understanding of any kind with any Person for the payment of any brokerage commission, finder's fee or any similar compensation in connection with this Agreement.

(f)    Litigation. Except as set forth on Section 7(f) of the Disclosure Schedule or claims made in connection with such Seller's Chapter 11 case, there are no Actions, claims, causes of action, proceedings, suits or investigations pending or, to the Knowledge of Seller, threatened, against such Seller

17

or any of the Acquired Assets before any Governmental Authority. Such Seller is not subject to any Order entered in any lawsuit or proceeding.

(g)     Equity Securities.  Section 7(g) of the Disclosure Schedule sets forth for each of the Transferred Subsidiaries an accurate and complete list of (i) each class and series of Equity Securities of such entities; (ii) the aggregate number of shares, units, membership interests or other denomination of Equity Securities of each class and series that are authorized for issuance; (iii) the aggregate number of shares, units, membership interests or other denomination of issued and outstanding Equity Securities of each such class and series; and (iv) a list of the names of each record and beneficial owner of such Equity Securities, and opposite the name of each such owner, the number, class, and series of Equity Securities owned by each such owner.

(h)     Product Registrations.

(i)     Such Seller and the Transferred Subsidiaries have obtained all product Registrations required to conduct the Business with respect to the Transferred Products as currently conducted in the United States, except for such failures as would not reasonably be expected to result in a Material Adverse Change. All such product Registrations are identified on Section 7(h)(i) of the Disclosure Schedule. All product Registrations relating to the Transferred Products are in full force and effect and are in material compliance with all Laws to maintain and support such Seller's operation of the Business with respect to the Transferred Products, including the marketing, sale and distribution of such Transferred Products.

(ii)     Except as otherwise set forth on Section 7(h)(ii) of the Disclosure Schedule, neither such Seller nor any of the Transferred Subsidiaries have received written notice from any Governmental Authority within the last twelve (12) months (x) indicating that any Transferred Registration (A) may be expiring, (B) will not be renewed or continued or (C) will be terminated or (y) requiring that additional Registration Data be provided in order to prevent the results in the immediately preceding clause (x) from occurring.

(i)     Transferred Inventory.  The Transferred Inventory conforms to such Seller's specifications, is salable in the Ordinary Course of Business and has been stored and maintained in the Ordinary Course of Business by such Seller or the applicable Transferred Subsidiaries.

(j)     Transferred Subsidiaries.  To the Knowledge of Seller (after a reasonable inquiry of the officers and employees of Willowood who would be reasonably expected to have knowledge of the matters), since April 20, 2016, none of the Transferred Subsidiaries have (i) conducted any operations (other than to hold the applicable Transferred Registrations), (ii) employed any employees or retained any independent consultants or advisors, (iii) opened any bank accounts, or (iii) entered into any Contracts (other than (x) the Credit Agreement and the ancillary agreements related thereto and (y) the applicable Contracts set forth on Section 7(d) of the Disclosure Schedule).

(k)     TERMS OF SALE.  EXCEPT AS OTHERWISE SPECIFICALLY SET FORTH IN THIS AGREEMENT, THE ACQUIRED ASSETS ARE BEING SOLD TO BUYER ON AN "AS-IS, WHERE IS" BASIS, WITHOUT WARRANTY. SUCH SELLER HEREBY DISCLAIMS ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.  BUYER HEREBY ACKNOWLEDGES AND AGREES THAT SUCH BUYER, AND ITS SUCCESSORS AND ASSIGNS, SHALL BEAR ALL RISKS OF INJURY OR DAMAGE TO PERSONS OR PROPERTY TO THE EXTENT RELATING TO THE OPERATION OF THE ACQUIRED ASSETS ON AND AFTER THE CLOSING DATE.

18

18829421

**8.     Representations and Warranties of Buyer**. Buyer represents and warrants to the Seller Parties as follows:

(a)     Organization of Buyer; Authorization. Buyer is a corporation duly organized, validly existing and in good standing under the Laws of the State of California, and has the requisite organizational power and authority to execute and deliver this Agreement and the Ancillary Documents to which Buyer will be a party and to perform its obligations hereunder and thereunder. The execution, delivery and performance of this Agreement and the Ancillary Documents to which Buyer is a party have been duly authorized by all necessary organizational action of Buyer. This Agreement has been duly and validly executed by Buyer and, subject to the entering of the Sale Order by the Bankruptcy Court and the due authorization, execution and delivery of this Agreement by the Seller Parties, constitutes a legal, valid and binding obligation of Buyer, enforceable against it in accordance with its terms. The Ancillary Documents to which Buyer will be a party will be duly and validly executed and delivered by Buyer and, assuming the due authorization, execution and delivery of such Ancillary Documents by the other parties thereto, will constitute a legal, valid and binding obligation of Buyer, enforceable against it in accordance with its terms.

(b)     No Conflict as to Buyer. Neither the execution and delivery of this Agreement or the Ancillary Documents to which Buyer will be a party, nor the consummation of any or all of the transactions contemplated hereby or thereby, will (i) violate the articles of organization or operating agreement (or other governing instrument) of any Buyer; (ii) violate, be in conflict with, or constitute a default under, or require the consent of any third party to, any material contract or other agreement to which any Buyer is a party; or (iii) to the knowledge of any Buyer, violate any statute, law or regulation of any Governmental Authority applicable to any Buyer.

(c)     Brokers; Agents. No investment banker, broker, finder or similar agent has been employed by or on behalf of Buyer in connection with this Agreement, and Buyer has not entered into any agreement, arrangement or understanding of any kind with any Person for the payment of any brokerage commission, finder's fee or any similar compensation in connection with this Agreement.

(d)     Adequate Assurance Regarding Assumed Contracts. As of the Closing, Buyer shall be capable of satisfying Section 365(b)(1)(C) of the Bankruptcy Code with respect to the Assumed Contracts and shall supply reasonably sufficient information as required by the Bankruptcy Court or by agreement with the counterparties to such Assumed Contracts. Buyer shall take actions reasonably required to assist in obtaining a finding by the Bankruptcy Court in the Sale Order that Section 365(b)(1)(C) of the Bankruptcy Code has been satisfied with respect to the Assumed Contracts including providing evidence of such financial capability to the Seller Parties on or before the Auction Date for filing with the Bankruptcy Court following conclusion of the Auction.

(e)     Sufficiency of Funds. Buyer has sufficient funds, and, on the Closing Date, Buyer will have sufficient funds, to make the payments required pursuant to Section 3 and to perform its obligations with respect to the transactions contemplated by this Agreement. Buyer acknowledges that its obligations set forth in this Agreement are not contingent or conditioned upon any Person's ability to obtain or have at the Closing sufficient funds necessary to make the payments required pursuant to Section 3 or for Buyer to perform its obligations with respect to the transactions contemplated by this Agreement.

**9.     Additional Agreements of the Parties.**

(a)     Access; Records; Bankruptcy Papers. From and after the date hereof, authorized representatives of Buyer (including their accountants, advisors, potential financing sources, consultants and legal counsel) shall have the right, upon reasonable notice and at reasonable times, to inspect the

19

Acquired Assets and their condition and shall be provided reasonable access to the Seller Parties' respective officers, advisors, counsel, trade vendors, customers, properties and facilities to inspect the same; and, *provided,* that Buyer shall not take any action which unreasonably interferes with the Seller Parties' respective operation of the Business prior to the Closing Date in any material respect. From and after the date hereof, and to the extent permitted by Law, the Seller Parties shall give Buyer and its authorized representatives, full access to their respective books and records relating to the Acquired Assets and the Assumed Obligations, as Buyer may reasonably request, permit Buyer to make inspections thereof, and cause the Seller Parties' respective officers and advisors to furnish Buyer with such financial, Tax and other operating data and other information relating to the Acquired Assets and the Assumed Obligations as Buyer may reasonably request. The Seller Parties hereby agree that they will retain, until all appropriate statutes of limitations (including any extensions) expire, copies of all Tax Returns relating to the Acquired Assets and the Assumed Obligations and supporting work schedules and other records or information which may be relevant to such Tax Returns, except for such Tax Returns, supporting work schedules and other records which Buyer shall acquire as a consequence of this Agreement (*provided,* that the Seller Parties may elect not to retain any such copies if it gives such copies or make such copies available to Buyer), and that it will not destroy or otherwise dispose of such materials without first providing Buyer with a reasonable opportunity to review and copy such materials. Buyer hereby agrees that it will retain, until all appropriate statutes of limitations (including any extensions) expire, copies of all Tax Returns and supporting work schedules received from the Seller Parties pursuant to this Agreement and other records or information which may be relevant to such Tax Returns (*provided,* that Buyer may elect not to retain any such copies if Buyer gives such copies or makes such copies available to the Seller Parties), and that it will not destroy or otherwise dispose of such materials without first providing the Seller Parties with a reasonable opportunity to review and copy such materials. After the Closing Date, Buyer shall give the Seller Parties and their respective authorized representatives as well as any duly appointed Chapter 7 or Chapter 11 trustee or other duly appointed representative of the Seller Parties' bankruptcy estate pursuant to Section 323 of the Bankruptcy Code (the "Estate Representative") full access to the books and records acquired as a consequence of this Agreement for purposes of and relating to the prosecution of any claims and causes of action of the Seller Parties or which may be relevant to any claims objection process or which may otherwise be needed to enforce their remaining rights and defend their remaining obligations relating to the Acquired Assets and the Assumed Obligations or in connection with the Seller Parties' bankruptcy case, including any filings other than reporting required by the Bankruptcy Court, the Bankruptcy Code, or the United States Trustee. Buyer shall give no less than 30 days' notice to the Estate Representative if it intends to destroy any such documents so that the Estate Representative may take any actions reasonably necessary to preserve such documents. The Seller Parties will promptly deliver to Buyer copies of all pleadings, motions, notices, statements, schedules, applications, reports and other papers filed in the Seller Parties' Chapter 11 case relating to this Agreement or the transactions contemplated hereby.

(b)     Operation in the Ordinary Course. During the period between the date of this Agreement and the Closing, the Seller Parties shall operate the Business relating to the Transferred Products in the Ordinary Course of Business, subject to changes resulting from its Chapter 11 case and the requirements of the Bankruptcy Code and the Bankruptcy Court, and in compliance with all Laws. In furtherance of and without limiting the foregoing, the Seller Parties shall:

(i)     maintain and preserve all of the physical Acquired Assets (other than the Transferred Inventory) in the same condition as of the date hereof, ordinary wear and tear excepted;

(ii)     maintain the Transferred Inventory in the Ordinary Course of Business;

18829421

(iii)     perform all of its obligations under the Assigned Contracts, *provided,* that, except as otherwise required hereunder, the Seller Parties shall not be required to pay any Cure Amounts; and

(iv)     maintain insurance at presently existing levels so long as such insurance is available on commercially reasonable terms.

In furtherance of and without limiting the foregoing, the Seller Parties shall not, without the prior written consent of Buyer, sell, transfer, mortgage, encumber or otherwise dispose of any of the Acquired Assets other than in the Ordinary Course of Business, execute any Contract relating to the Acquired Assets other than in the Ordinary Course of Business, or agree to or make any commitment to take any actions prohibited by this Section 9(b).

(c)     Collection of Excluded Accounts Receivable. If, following the Closing, Buyer or any of its Affiliates receives or collects any funds relating to any Excluded Accounts Receivable, Buyer shall hold the same in trust for the benefit of the Seller Parties and shall remit such funds to the Seller Parties within 5 Business Days after its receipt thereof (by wire transfer of immediately available funds to such bank accounts and in such proportions as designated in writing by Willowood USA).

(d)     Notification; Updates to Schedules. During the period between the date of this Agreement and the Closing, the Seller Parties will promptly (and in any event within five Business Days) notify Buyer in writing of the discovery by any Seller of: (i) any event, condition, fact or circumstance that would result in any of the representations and warranties contained made by any Seller in Section 7 to no longer be true and correct in accordance with Section 10(a); and (ii) any material breach of any covenant or obligation of any Seller under this Agreement. No such update shall be deemed to supplement or amend the Disclosure Schedule for the purpose of determining whether any of the conditions set forth in Section 10(a) have been satisfied.

**10.     Conditions to Buyer's Obligation to Effect Closing**. The obligation of Buyer to effect the Closing shall be subject to the satisfaction, on or before the Closing Date, of the following conditions, any one or more of which may be waived by Buyer:

(a)     Representations and Warranties and Covenants. (i) The representations and warranties of the Seller Parties set forth in Section 7 shall be true and correct in all respects as of the Closing Date as then made (except to the extent such representations and warranties by their terms speak of an earlier date), except where the failure to be so true and correct, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Change, (ii) the Seller Parties shall have performed and complied in all material respects with the agreements contained in this Agreement required to be performed and complied with by the Seller Parties on or before the Closing, and (iii) Willowood USA shall have delivered to Buyer at the Closing certificates, dated the Closing Date, signed by its Chief Executive Officer, President or any Vice President certifying as to compliance with clauses (i) and (ii) above.

(b)     Sale Hearing. The Seller Parties shall have obtained the Bid Procedures Order from the Bankruptcy Court by no later than 28 days following the Petition Date, scheduling the Sale Hearing to occur by no later than 60 days following the Petition Date and scheduling the Auction to occur not more than two Business Days before the Sale Hearing.

(c)     Effectiveness of Sale Order. The Bankruptcy Court shall have entered the Sale Order by no later than the date that is 75 days following the date of this Agreement, and the effectiveness of such Sale Order shall not have been stayed or, if stayed, such stay shall no longer be in effect.

(d)      No Material Adverse Change.  From the date of this Agreement until the Closing Date, no Material Adverse Change shall have occurred.

(e)      No Litigation.  There shall not be any Order or Action pending or, to the Knowledge of Seller, threatened to be brought before any Governmental Authority relating to the Acquired Assets which, individually or in the aggregate, can reasonably be expected to result in a Material Adverse Change.

(f)      Transferred Subsidiaries.  All Liens (other than Permitted Liens) against the Transferred Subsidiaries (other than Assumed Liabilities directly against specific Transferred Subsidiaries) have been released.

(g)      Compliance With Bid Procedures Order; Notice.  The Seller Parties shall have complied with all requirements of the Bid Procedures Order, including the notice requirements provided therein.

(h)      Assumption and Rejection of Contracts.    The Contracts designated hereunder for assumption shall be so assumed by Order of the Bankruptcy Court satisfactory to Buyer.

**11.    Conditions to the Seller Parties' Obligation to Effect Closing**.  The obligation of the Seller Parties to effect the Closing shall be subject to the satisfaction, on or before the Closing Date, of the following conditions, any one or more of which may be waived by Willowood USA:

(a)      Representations and Warranties.  (i) The representations and warranties of Buyer set forth in Section 8 shall be true and correct in all respects as of the Closing Date as then made (except to the extent such representations and warranties by their terms speak of an earlier date), except where the failure to be so true and correct, individually or in the aggregate, would not reasonably be expected to have a material adverse effect on Buyer, and (ii) Buyer shall have performed and complied in all material respects with the agreements contained in this Agreement required to be performed and complied with by Buyer on or before the Closing, and (iii) Buyer shall have delivered to the Seller Parties at the Closing certificates, dated the Closing Date, signed by its Chief Executive Officer, President or any Vice President certifying as to compliance with clauses (i) and (ii) above.

(b)      Effectiveness of Sale Order.  The Bankruptcy Court shall have entered the Sale Order, two days shall have elapsed since the Sale Order was entered (*provided,* that if the second day after the Sale Order is entered is not a Business Day, such period shall be deemed to have elapsed on the first Business Day following such second day), and the effectiveness of the Sale Order shall not have been stayed or, if stayed, such stay shall no longer be in effect.

(c)      No Litigation.  There shall not be any Order or Action pending, to the Knowledge of Seller, or threatened to be brought before any Governmental Authority relating to the Acquired Assets which, individually or in the aggregate, can reasonably be expected to result in a Material Adverse Change.

**12.    Termination; Effect of Termination.**

(a)      Termination.  This Agreement may be terminated before the Closing occurs only as follows:

(i)      by Buyer, if (A) the conditions set forth in Section 10 shall not have been satisfied or waived on or before the date that is 90 days following the date of this Agreement (the "Outside Date"), (B) Buyer reasonably determines that the timely satisfaction of any condition set

22

forth in Section 10 has become impossible or impractical, or (C) if any Seller has breached any material covenant or obligation contained in this Agreement and such breach shall not have been cured within 10 days after the delivery of written notice thereof to the Seller Parties (in each case, other than as a result of any failure on the part of Buyer to comply with or perform its covenants and obligations set forth in this Agreement);

(ii) by the Seller Parties, if (A) the conditions set forth in Section 10(h) shall not have been satisfied or waived on or before the Outside Date, or (B) if Willowood USA reasonably determines that the timely satisfaction of any condition set forth in Section 10(h) has become impossible or impractical, or (C) if Buyer has breached any material covenant or obligation contained in this Agreement and such breach shall not have been cured within 10 days after the delivery of written notice thereof to Buyer (other than as a result of any failure on the part of the Seller Parties to comply with or perform their covenants and obligations set forth in this Agreement);

(iii) by Buyer, if (A) the Bid Procedures Order has not been entered by the date that is 28 days following the Petition Date, (B) the Sale Order has not been entered by the date that is 75 days following the date of this Agreement, or if, prior to such date, the Bankruptcy Court approves another transaction involving the sale or other transfer of any of the Acquired Assets to a third party or (C) Buyer is not designated by the Seller Parties to be the highest and best bidder for the Acquired Assets at the Auction held by the date that is 68 days following the date of this Agreement; or

(iv) by the mutual written agreement of Buyer and the Seller Parties.

(b) Breakup Fee. The Seller Parties shall be required to pay Buyer a termination fee of five hundred thousand dollars ($500,000) (the "Breakup Fee") *plus* reasonable out-of-pocket incurred by Buyer in an amount not to exceed one hundred twenty five thousand dollars ($125,000) (the "Expense Reimbursement") upon the consummation of an Alternative Transaction, which obligation shall constitute an allowed administrative expense claim against the Seller Parties under Sections 503 and 507(a) of the Bankruptcy Code, payable from the proceeds of an Alternative Transaction; *provided, however,* that Buyer shall not be entitled to the Breakup Fee if Buyer shall have breached its obligations under this Agreement in any material respect or shall have terminated this Agreement pursuant to Section 12(a).

(c) No Further Liability. If this Agreement is terminated by the Seller Parties or Buyer pursuant to this Section 12, neither party shall have any further obligation or liability under this Agreement, except that the provisions of Sections 12 and 16 shall survive and any party that has materially breached this Agreement shall not be relieved of any liability hereunder.

**13. Tax Allocations.** Except as set forth in Section 14 (with respect to Transfer Taxes):

(a) The Seller Parties shall prepare and file all income Tax Returns of the Seller Parties for all Tax periods, and, for any Tax period or the portion of any Tax period ending on or before the Closing Date, the Seller Parties shall be responsible for preparing and timely filing all Tax Returns required by Law to be filed with respect to the Acquired Assets prior to the Closing Date, and for the payment of all Taxes shown as due and payable on such Tax Returns.

(b) Buyer shall prepare and timely file all Tax Returns with respect to the Acquired Assets other than those Tax Returns described in Section 13(a), including Tax Returns for any Tax period beginning before the Closing Date and ending after the Closing Date (or portion thereof) (a "Straddle Period"), other than income Tax Returns of the Seller Parties.

18829421

(c)     With respect to Tax Returns prepared and filed by Buyer pursuant to Section 13(b) pertaining to any Straddle Period, (i) Buyer shall prepare and submit such Tax Returns to the Seller Parties for the Seller Parties' review, comment, and consent at least fifteen Business Days prior to the due date thereof and make all changes reasonably requested by the Seller Parties, and (ii) the Seller Parties shall, no later than three Business Days prior to the due date of such Tax Returns, pay Buyer the amount of Taxes that are due and payable with such Tax Returns and which are attributable to that portion of such Straddle Period ending on the Closing Date.

(d)     The Seller Parties shall have the right to control the conduct of any Action with respect to Tax Returns filed or to be filed by the Seller Parties pursuant to Section 13(a). Buyer shall have the right to control the conduct of any Action with respect to Tax Returns to be filed by Buyer pursuant to Section 13(b).

(e)     Any refunds attributable to (i) Tax Returns described in Section 13(a), and (ii) Tax Returns for a Straddle Period that pertain to the portion of such Straddle Period ending on the Closing Date, shall be for the account of the Seller Parties. Any refunds attributable to (i) Tax Returns described in Section 13(b) other than Tax Returns for Straddle Periods and (ii) Tax Returns for a Straddle Period that pertain to the portion of such Straddle Period beginning on the Closing Date after the Closing, shall be for the account of Buyer.

(f)     Buyer and the Seller Parties shall each cooperate with the reasonable requests of the other in the preparation and filing of Tax Returns pursuant to this Section 13 and in the conduct of any audit or other Action relating to Taxes involving the Acquired Assets. Buyer and the Seller Parties agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Acquired Assets as is reasonably necessary for the audit by any Governmental Authority, and the prosecution or defense of any Action relating to any Tax.

**14.     Transfer Taxes.** Transfer Taxes arising out of the transactions effected pursuant to this Agreement shall be paid by Buyer. Buyer shall prepare and timely file all Tax Returns with respect to such Transfer Taxes and provide copies of each such Tax Returns within five Business Days after filing.

**15.     Jurisdiction.** The parties agree that the Bankruptcy Court shall retain jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement, or the breach hereof.

**16.     Miscellaneous.**

(a)     Notices. All notices and other communications pursuant to this Agreement shall be in writing and shall be deemed given if delivered personally, sent by electronic mail or other customary means of electronic communication, sent by nationally-recognized overnight courier or mailed by registered or certified mail (return receipt requested), postage prepaid, to the parties at the addresses set forth below or to such other address as the party to whom notice is to be given may have furnished to the other parties in writing in accordance herewith. Any such notice or communication shall be deemed to have been delivered and received (i) in the case of personal delivery, on the date of such delivery, (ii) in the case of electronic mail or other customary means of electronic communication, on the date sent if either (A) confirmation of receipt is received or (B) such notice is promptly mailed by registered or certified mail (return receipt requested), (iii) in the case of a nationally recognized overnight courier in circumstances under which such courier guarantees next Business Day delivery, on the next Business Day after the date sent, and (iv) in the case of mailing, on the third Business Day following that on which the piece of mail containing such communication is posted.

24

If to Buyer, to:

>AMVAC Chemical Corporation
>4695 MacArthur Court, Suite 1200
>Newport Beach, CA 92660
>Attn: Timothy J. Donnelly
>timd@amvac-chemical.com

with a copy (which shall not constitute notice) to:

>Buchalter, a Professional Corporation
>18400 Von Karman Ave, Suite 800
>Irvine, CA 92612
>Attn: Jeffrey Garfinkle
>E-mail: jgarfinkle@buchalter.com

If to the Seller Parties to:

>Willowood USA LLC
>c/o R2 Advisors, LLC
>1350 17th Street, Suite 206
>Denver, CO 80202
>Attention: Kevin Mitchell, Chairman
>E-mail: kjm@lariatpartners.net

with a copy (which shall not constitute notice) to:

>Brownstein Hyatt Farber Schreck, LLP
>410 Seventeenth Street, Suite 2200
>Denver, CO 80202-0947
>Attention: Michael Pankow
>        Matthew Nyberg
>E-mail:   mpankow@bhfs.com
>        mnyberg@bhfs.com

If to Agent to:

>Tree Line Direct Lending, LP
>101 California Street, Suite 1700
>San Francisco, CA 94111
>Attention: Frank Cupido
>E-mail:   fcupido@treelinecp.com

with a copy (which shall not constitute notice) to:

>Latham & Watkins LLC
>330 North Wabash Avenue, Suite 2800
>Chicago, IL 60611
>Attention: Matthew L. Warren
>E-mail:   matthew.warren@lw.com

18829421

(b)     Press Releases; Disclosure.  The parties hereto will cooperate in the issuance of any press releases or otherwise in making any public statements with respect to this Agreement and the transactions contemplated hereby.  Neither Buyer nor any Seller shall issue any press release regarding this Agreement or the transactions contemplated hereby without the other party's prior written consent, which consent shall not be unreasonably withheld.  Buyer acknowledges and agrees that the Seller Parties may provide copies of this Agreement and the schedules and exhibits attached hereto to the parties in interest in the Seller Parties' Chapter 11 case, and those parties the Seller Parties determine it is necessary to provide copies to in connection with the Auction or as otherwise necessary in connection with the Seller Parties' Chapter 11 case.  The Seller Parties also shall be entitled to file copies of this Agreement and the schedules and exhibits attached hereto with the Bankruptcy Court or as otherwise required by law.

(c) Entire Agreement.  This Agreement and the instruments, agreements, and other documents contemplated hereby supersede all prior discussions and agreements between the parties with respect to the matters contained herein (excluding the confidentiality letter agreement, dated as of November 28, 2018, by and between Buyer and Piper Jaffray & Co. on behalf of Willowood USA and its Affiliates which shall remain in full force and effect), and this Agreement and the instruments, agreements and other documents contemplated hereby contain the entire agreement between the parties hereto with respect to the transactions contemplated hereby.

(d)     Further Assurances.  After the Closing, each of the parties hereto shall, at the reasonable request of the other party hereto, execute and deliver such other instruments of transfer or assumption and further documents and agreements, and do such further acts and things as may be necessary to carry out the provisions of this Agreement.

(e)     Waiver.  Any term or condition of this Agreement may be waived at any time by the party thereto which is entitled to the benefit thereof, but such waiver shall only be effective if evidenced by a writing signed by such party.  A waiver on one occasion shall not be deemed to be a waiver of the same of any other breach on a future occasion.

(f)     Amendment.  Except as otherwise expressly provided herein, this Agreement may be amended only by a writing signed by all the parties hereto.

(g)     Counterparts; Execution.  This Agreement may be executed in one or more counterparts, all of which taken together shall be deemed and considered one and the same Agreement, and same shall become effective when counterparts have been signed by each party and each party has delivered its signed counterpart to the other party.  A digital reproduction, portable document format (".pdf") or other reproduction of this Agreement may be executed by one or more parties hereto and delivered by such party by electronic signature (including signature via DocuSign or similar services), electronic mail or any similar electronic transmission device pursuant to which the signature of or on behalf of such party can be seen.  Such execution and delivery shall be considered valid, binding and effective for all purposes.

(h)     Binding Agreement; Assignment; No Third Party Beneficiaries.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.  This Agreement may not be assigned by any party hereto without the prior written consent of the other party, and any purported assignment without such consent shall be void; *provided, however*, that notwithstanding the above, Buyer may, by written notice delivered to the Seller Parties not less than three (3) Business Days prior to the Closing Date, designate one or more of its Affiliates to assume all of the obligations and rights of Buyer hereunder effective as of the Closing Date, *provided* that no such assignment shall relieve Buyer of its obligations under this Agreement.  This Agreement is not made for the benefit of any third party (including any non-Seller parties to the Assigned Contracts), and

18829421

no third party shall be deemed to be a beneficiary hereof. No provision of this Agreement shall create any third-party beneficiary or other rights in any current or former employee, consultant or contractor (including any beneficiary or dependent thereof) of the Seller Parties in respect of continued employment or affiliation or resumed employment or affiliation with Buyer.

(i)     Governing Law. This Agreement shall be governed by the Laws of the State of Colorado, without regard to the conflict of laws principles thereof.

(j)     Headings. The headings in this Agreement are for convenience of reference only and should not be deemed a part of this Agreement.

(k)     Expenses. Except as otherwise expressly provided herein, each of the parties hereto shall pay their own fees and expenses in connection with the negotiation, preparation, execution and delivery of this Agreement and the other instruments and agreements entered into pursuant to this Agreement, and any amendments to the same.

(l)     Records. The Seller Parties may copy and maintain any records that it believes are necessary. In the event that any Seller does not retain copies of such records and insofar as such Seller reasonably believes the records may be needed or useful in connection with federal, state or local regulatory or Tax matters, resolution of disputes, litigation, or contract compliance issues, to the extent that Buyer has maintained such records, Buyer will give such Seller access to such records and such Seller shall have the right to copy and review at its own expense those records that Buyer has available upon reasonable request from such Seller to Buyer.

(m)     Agent.

(i)     Notwithstanding anything to the contrary herein, the Agent (for itself and the Lenders (as defined in the Credit Agreement)) will be deemed a third party beneficiary hereunder entitled to exercise and enforce any and all rights, powers, privileges and remedies of the Seller Parties pursuant to this Agreement or any other agreement, instrument or document executed in connection herewith and, as provided in the applicable Credit Documents (as defined in the Credit Agreement), the Agent, for the benefit of itself and Lenders, will have a first priority Lien on the Seller Parties' respective right, title and interest in and to this Agreement and the other agreements, instruments and documents executed in connection herewith. Without limiting the generality of the foregoing, and notwithstanding anything to the contrary in this Agreement or in any other agreement, instrument or document executed in connection herewith, the Seller Parties will not exercise any right to terminate, or execute and deliver or otherwise provide any waivers, consents or amendments under, this Agreement or any of the other agreements, instruments or documents executed in connection herewith, without the prior written consent of the Agent (which shall not be unreasonably withheld, conditioned or delayed).

(ii)     Notwithstanding anything to the contrary in this Agreement or any other agreement, instrument or document executed in connection herewith, none of the Agent or the Lenders (x) is making any representations or warranties to any or all of the Seller Parties, Buyer or any of their respective Affiliates in connection with this Agreement or any other agreement, instrument or document executed in connection herewith, or the transactions contemplated herein or therein, (y) will be liable to any Person for any breach by any or all of the Seller Parties, Buyer or any of their respective Affiliates of any of their respective representations, warranties, covenants or other agreements in connection with this Agreement or any other agreement, instrument or document executed in connection herewith or any of the transactions contemplated herein or therein, or (z) will have any obligations or liabilities under or in respect of any of this

18829421

Agreement or any other agreement, instrument or document executed in connection herewith or any of the transactions contemplated herein or therein. Without limiting the generality of the foregoing, under no circumstances will any or all of the Agent and the Lenders be obligated to return or otherwise disgorge to or for the benefit of Buyer or any Affiliate thereof any proceeds of the Purchase Price or other amounts remitted to any or all of the Agent and the Lenders.

(n)     Disclosure Schedule.     Each section of the Disclosure Schedule qualifies the correspondingly numbered representation and warranty or covenant and any other representation or warranty, if the disclosure is reasonably apparent to such other representation or warranty. The Disclosure Schedule is qualified in its entirety by reference to specific provisions of the Agreement, and is not intended to constitute, and shall not be construed as constituting, any representation or warranty or covenant of the Seller Parties, except as and to the extent expressly provided in the Agreement. Inclusion of information in the Disclosure Schedule shall not be construed as an admission that such information is material to the Seller Parties or any of their respective Subsidiaries or their respective assets, liabilities, financial condition, results, business or operations. The fact that any item of information is contained in the Disclosure Schedule shall not be construed to mean that such information is required to be disclosed by the Agreement. Such information shall not (i) be used as a basis for interpreting the term "material," "materially" or "materiality" in the Agreement or (ii) constitute an admission of liability or obligation to any third party. References to any document in the Disclosure Schedule do not purport to be complete and are qualified in their entirety by the document itself. Capitalized terms used but not defined in the Disclosure Schedule shall have the same meanings given them in this Agreement.

[Signatures on Next Page]

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed on the date first above written.

**BUYER**:

AMVAC CHEMICAL CORPORATION

By: _____
Name: _____
Title: _____

**SELLER PARTIES**:

WILLOWOOD USA, LLC

By: _____
Name:   Jason Urband
Title:   Chief Executive Officer


WILLOWOOD, LLC

By: _____
Name:   Jason Urband
Title:   Chief Executive Officer


RIGHTLINE LLC

By: _____
Name:   Jason Urband
Title:   Chief Executive Officer


GREENFIELDS MARKETING, LTD.

By: _____
Name:   Jason Urband
Title:   Chief Executive Officer

## **SCHEDULE 1(b)(i)**

### **ASSIGNED CONTRACTS**

1. Abamectin Data Compensation Settlement Agreement between Syngenta Crop Protection, LLC and Willowood Abamectin, LLC

2. Glufosinate Data Compensation Settlement Agreement between Bayer Cropscience LP and Willowood

3. Oxyfluorfen Data Compensation Agreement Between Willowood Oxyfluorfen LLC and Dow Agrosciences LLC

4. Paraquat Data Compensation Agreement Between Syngenta Crop Protection LLC and Willowood Paraquat LLC

5. Propyzamide Data Compensation Agreement Between Willowood Pronamide, LLC and Dow AgroSciences LLC

6. Sulfentrazone Data Compensation Settlement Agreement between FMC Corporation and Willowood Sulfentrazone LLC and Willowood LLC

7. Purchase Order for Clomazone 3ME with Sulphur Mills

8. Purchase Order for Thiobencard Tech with India Pesticides, Ltd.

9. Purchase Order for Thionil RM – Isophrone with Dow Chemical

10. Supply Agreement for Propanil 80 DF with Source Dynamics LLC

11. Propanil – The Propanil Task Force and the Propanil Task Force II and Willowood Propanil, LLC, FIFRA Case No. 16171 Y 00587 11/16 20 110 0587 (American Arbitration Association)

12. Purchase Order for Sulfentrazone repack with MicroChem Corp.

13. Purchase Order for Propanil 4SC production with MicroChem Corp.

14. Purchase Order for Clomazone repack with Schirm

15. Purchase Order for Thionil production with MicroChem Corp.

**SCHEDULE 1(b)(ii)**

**TRANSFERRED PRODUCTS**

| Registration | Holder of the Registration | EPA Registration Number |
|---|---|---|
| Abamectin Technical | Willowood Abamectin, LLC | 89349-1 |
| Willowood Abamectin 0.15EC | Willowood, LLC | 87290-58 |
| Willowood Abamectin 0.7SC | Willowood, LLC | 87290-36 |
| Willowood Abamectin EC | Willowood, LLC | 87290-57 |
| Willowood Abamectin 0.15LV | Willowood, LLC | 87290-68 |
| Willowood Nemamectin 0.7SC | Willowoood, LLC | 87290-84 |
| RighLine Nemamectin 0.7 SC | RightLine LLC | 87290-84-93051 |
| Chlorimuron Ethyl Technical | Greenfields Marketing Ltd. | 89966-11 |
| Willowood Chlorim 25WDG | Willowood, LLC | 87290-86 |
| Clomazone Technical | Greenfields Marketing Ltd. | 89966-1 |
| Willowood Clomazone 3ME | Willowood, LLC | 87290-55 |
| Willowood Clomazone 5MEG | Willowood, LLC | 87290-46 |
| Willowood Clomazone ME | Willowood, LLC | 87290-47 |
| Cloransulam-methyl Technical | Greenfields Marketing Ltd. | 89966-9 |
| Willowood Cloransulam 84% | Willowood, LLC | 87290-87 |
| Glufosinate-Ammonium Technical | Willowood Glufosinate Ammonium, LLC | 89707-1 |
| Willowood Glufosinate 280SL | Willowood, LLC | 87290-41 |

| Registration | Holder of the Registration | EPA Registration Number |
|---|---|---|
| Imazethapyr Technical | Greenfields Marketing Ltd. | 89966-7 |
| Willowood Imazethapyr 2SL | Willowood, LLC | 87290-69 |
| Lactofen Technical | Greenfields Marketing Ltd. | 89966-8 |
| Lactofen MUP | Greenfields Marketing Ltd. | 89966-13 |
| Willowood Lactofen 2EC | Willowood, LLC | 87290-72 |
| Metribuzin Technical | Greenfields Marketing Ltd. | 89966-6 |
| Willowood Metribuzin 4SC | Willowood, LLC | 87290-80 |
| Willowood Metribuzin 75DF | Willowood, LLC | 87290-79 |
| Oxyfluorfen Technical | Willowood Oxyfluorfen, LLC | 87283-1 |
| Willowood Oxyflo 2 EC | Willowood, LLC | 87290-8 |
| Willowood Oxyflo 4 SC | Willowood, LLC | 87290-10 |
| Paraquat Technical | Willowood Paraquat, LLC | 89275-1 |
| Willowood Paraquat 3SL | Willowood, LLC | 87290-35 |
| Pronamide Technical | Willowood Pronamide, LLC | 87285-1 |
| Willowood Pronamide 3.3SC | Willowood, LLC | 87290-22 |
| Willowood Pronamide 50WSP | Willowood, LLC | 87290-3 |
| RightLine Pronamide 3.3 SC | RightLine LLC | 87290-22-93051 |
| Propanil Technical | Willowood Propanil, LLC | 87829-1 |
| Willowood Propanil 4EC | Willowood, LLC | 87290-32 |

18829421

| Registration | Holder of the Registration | EPA Registration Number |
|---|---|---|
| Willowood Propanil 4SC | Willowood, LLC | 87290-18 |
| Willowood Propanil 80DF | Willowood, LLC | 87290-17 |
| Sulfentrazone Technical Herbicide | Willowood Sulfentrazone, LLC | 91459-1 |
| Willowood Sulfen MTZ DF | Willowood, LLC | 87290-70 |
| Willowood Sulfen Cloran | Willowood, LLC | 87290-82 |
| Willowood Sulfen 4SC | Willowood, LLC | 87290-59 |
| Willowood Sulfentrazone 62.22%+Chlorimuron 7.78% WG | Willowood, LLC | 87290-83 |
| Willowood Sulfentrazone 33.3% + Imazethapyr 6.67% SC | Willowood, LLC | 87290-67 |
| RightLine Sulfen 4SC | RightLine LLC | 87290-59-93051 |
| Thiobencarb Technical | Greenfields Marketing Ltd. | 89966-14 |
| Willowood Thioben 8EC | Willowood, LLC | 87290-75 |
| Willowood Thionil EC | Willowood, LLC | 87290-74 |
| Willowood Thio UltraMax | Willowood, LLC | 87290-73 |

## SCHEDULE 2(a)(i)

## TRANSFERRED REGISTRATIONS

1. Abamectin
2. Clomazone
3. Cloransulam
4. Clorimuron
5. Glufosinate
6. Imazethapyr
7. Lactofen
8. Metribuzin
9. Oxflurofen
10. Paraquat
11. Pronamide
12. Propanil
13. Sulfentrazone
14. Thiobencarb

## **SCHEDULE 2(a)(ii)**

### **TRANSFERRED DATA**

Transferred Data is available in the data room maintained by Piper Jaffray & Co.

## SCHEDULE 2(a)(viii)

### TRANSFERRED SUBSIDIARIES

1. Willowood Abamectin, LLC
2. Willowood Glufosinate Ammonium, LLC
3. Willowood Oxyfluorfen, LLC
4. Willowood Paraquat, LLC
5. Willowood Pronamide, LLC
6. Willowood Propanil, LLC
7. Willowood Sulfentrazone, LLC

## SCHEDULE 2(c)

## CURE AMOUNTS

| Contract | Description | Notes | Estimated Cure Costs as of 2-20-19 | Estimate, as of 2-20-19, of Cure Amount as of Closing |
|---|---|---|---|---|
| Abamectin Data Compensation Settlement Agreement between Syngenta Crop Protection, LLC and Willowood Abamectin, LLC | Data Compensation Agreement-Abamectin | | - | - |
| Glufosinate Data Compensation Settlement Agreement between Bayer Cropscience LP and Willowood | Data Compensation Agreement-Glufosinate | | - | - |
| Oxyfluorfen Data Compensation Agreement Between Willowood Oxyfluorfen LLC and Dow Agrosciences LLC | Data Compensation Agreement-Oxyflo | | - | - |
| Paraquat Data Compensation Agreement Between Syngenta Crop Protection LLC and Willowood Paraquat LLC | Data Compensation Agreement-Paraquat | | - | - |
| Propyzamide Data Compensation Agreement Between Willowood Pronamide, LLC and Dow AgroSciences LLC | Data Compensation Agreement-Pronamide | | - | - |
| Sulfentrazone Data Compensation Settlement Agreement between FMC Corporation and Willowood Sulfentrazone LLC and Willowood LLC | Data Compensation Agreement-Sulfentrazone | | - | - |
| Purchase Order | Purchase order for Clomazone 3ME | | $ [     ] | $ [     ] |
| Purchase Order | Purchase order for Thiobencarb Tech | | $ [     ] | $ [     ] |
| Purchase Order | Dow Payment - Isophorone Supply Agreement for Propanil 80 DF | Anticipate paying the balance on or prior to February 22, 2019 or through a critical vendor payment. | $ [     ] | - |
| Supply Agreement | | | - | - |
| Purcahse Order | Sulfentrazone repack | Anticipate that all payments will be made prior to close. Confirming the current amounts due. | | - |
| Purcahse Order | Propanil 4SC production | Anticipate that all payments will be made prior to close. Confirming the current amounts due. | | - |
| Purcahse Order | Clomazone repack | Anticipate that all payments will be made prior to close. Confirming the current amounts due. | | - |
| Purcahse Order | Thionil production | Anticipate that all payments will be made prior to close. Confirming the current amounts due. | | - |
| | | Total | $ [     ] | $ [     ] |

## SCHEDULE 3(d)

## SCHEDULE OF ALLOCATION OF PURCHASE PRICE[1]

---

[1] Note to draft: To be completed post-signing pursuant to Section 3(d).

18829421

## **SCHEDULE 4(b)(vi)**

### **ASSUMED DATA COMPENSATION LIABILITY**

The Seller Parties' or their respective Subsidiaries' known and unknown future liabilities arising pursuant to FIFRA (or any similar state or local laws regulating pesticides) ("**Data Compensation Lability**") with respect to the Transferred Registrations issued to or applied for by the Seller Parties. For the following Transferred Registrations, settled Data Compensation Liabilities as well as unknown future Data Compensation Liabilities are governed by the agreements or arbitration award identified below:

- Abamectin – Abamectin Data Compensation Settlement Agreement between Syngenta Crop Protection, LLC and Willowood Abamectin, LLC
- Glufosinate – Glufosinate Data Compensation Settlement Agreement between Bayer Cropscience LP, Willowood USA, LLC, Willowood, LLC, and Willowood Glufosinate Ammonium, LLC
- Oxyfluorfen – Oxyfluorfen Data Compensation Agreement Between Willowood Oxyfluorfen LLC and Dow Agrosciences LLC
- Paraquat – Paraquat Data Compensation Agreement Between Syngenta Crop Protection LLC and Willowood Paraquat LLC
- Propyzamide – Propyzamide Data Compensation Agreement Between Willowood Pronamide, LLC and Dow AgroSciences LLC
- Sulfentrazone – Sulfentrazone Data Compensation Settlement Agreement between FMC Corporation and Willowood Sulfentrazone LLC and Willowood LLC
- Propanil – The Propanil Task Force and the Propanil Task Force II and Willowood Propanil, LLC, FIFRA Case No. 16171 Y 00587 11/16 20 110 0587 (American Arbitration Association)

For the following Transferred Registrations, Data Compensation Liabilities are unsettled and not governed by any agreement:

- Chlorimuron Ethyl
- Clomazone
- Cloransulam
- Imazethapyr
- Lactofen
- Metribuzin
- Thiobencarb

18829421

**DISCLOSURE SCHEDULE**

**to the**

**ASSET PURCHASE AGREEMENT**

**by and among**

**AMVAC CHEMICAL CORPORATION**

**WILLOWOOD USA, LLC,**

**WILLOWOOD, LLC,**

**RIGHTLINE LLC**

**and**

**GREENFIELDS MARKETING LTD.**

**Dated February 26, 2019**

Each section of this disclosure schedule (the "Disclosure Schedule") qualifies the correspondingly numbered representation and warranty or covenant and any other representation or warranty of that certain Asset Purchase Agreement (the "Agreement"), dated as of February 26, 2019, by and among Amvac Chemical Corporation, a California corporation ("Buyer"), Willowood USA, LLC, an Oregon limited liability company ("Willowood USA"), Willowood, LLC, an Oregon limited liability company ("Willowood"), RightLine LLC, an Oregon limited liability company ("RightLine") and Greenfields Marketing Ltd., a private company organized under the laws of the United Arab Emirates ("Greenfields", and collectively with RightLine, Willowood USA and Willowood, the "Seller Parties" and each a "Seller"), if the disclosure is reasonably apparent to such other representation or warranty. This Disclosure Schedule is qualified in its entirety by reference to specific provisions of the Agreement, and is not intended to constitute, and shall not be construed as constituting, any representation or warranty or covenant of the Seller Parties, except as and to the extent expressly provided in the Agreement. Inclusion of information in this Disclosure Schedule shall not be construed as an admission that

18715093.9

such information is material to the Seller Parties or any of their respective Subsidiaries or their respective assets, liabilities, financial condition, results, business or operations. The fact that any item of information is contained in this Disclosure Schedule shall not be construed to mean that such information is required to be disclosed by the Agreement. Such information shall not (a) be used as a basis for interpreting the term "material," "materially" or "materiality" in the Agreement or (b) constitute an admission of liability or obligation to any third party. References to any document in this Disclosure Schedule do not purport to be complete and are qualified in their entirety by the document itself. Capitalized terms used but not defined in this Disclosure Schedule shall have the same meanings given them in the Agreement.

## Section 7(b)
## No Conflicts; Consents

- Abamectin Data Compensation Settlement Agreement between Syngenta Crop Protection, LLC and Willowood Abamectin, LLC, dated January 15, 2015

- Glufosinate Data Compensation Settlement Agreement between Bayer Cropscience LP and Willowood, dated March 9, 2016

3

<u>Section 7(d)</u>
**Contracts**

| Entity Engaged in Contract | Vendor | Title of Contract | Description of Service | Contract Expiration |
|---|---|---|---|---|
| Willowood USA, LLC | CHEMTREC | CHEMTREC Agreement—Worldwide Authorization | Import Coverage for period 12/1/18-11/30/19 | 11/30/2019 |
| WW Abamectin, LLC; Willowood, LLC | Syngenta Crop Protection, LLC | Abamectin Data Compensation Settlement Agreement between Syngenta Crop Protection, LLC and Willowood Abamectin, LLC | Data Compensation Agreement-Abamectin | n/a |
| WW Glufosinate, LLC; Willowood, LLC; Willowood USA, LLC | Bayer | Glufosinate Data Compensation Settlement Agreement between Bayer Cropscience LP and Willowood | Data Compensation Agreement-Glufosinate | n/a |
| WW Oxyfluorfen, LLC | Dow | Oxyfluorfen Data Compensation Agreement Between Willowood Oxyfluorfen LLC and Dow Agrosciences LLC | Data Compensation Agreement-Oxyflo | n/a |
| WW Paraquat, LLC | Syngenta | Paraquat Data Compensation Agreement Between Syngenta Crop Protection LLC and | Data Compensation Agreement-Paraquat | n/a |

4

18715093.9

| Entity Engaged in Contract | Vendor | Title of Contract | Description of Service | Contract Expiration |
|---|---|---|---|---|
| | | Willowood Paraquat LLC | | |
| WW Pronamide, LLC | Dow | Propyzamide Data Compensation Agreement Between Willowood Pronamide, LLC and Dow AgroSciences LLC | Data Compensation Agreement-Pronamide | n/a |
| WW Sulfentrazone, LLC; Willowood, LLC | FMC | Sulfentrazone Data Compensation Settlement Agreement between FMC Corporation and Willowood Sulfentrazone LLC and Willowood LLC | Data Compensation Agreement-Sulfentrazone | n/a |
| Willowood USA, LLC | GS1 US, Inc. | | UPC Barcodes Renewal 7/1/18-6/30/19-Important | 6/30/2019 |
| Willowood USA, LLC | Meister Media | | Use of PureIntel Services- Software Subscription, Coverage Period 9/1/18 - 8/31/19 | 8/31/2019 |
| Willowood USA, LLC | CDMS, Inc. | Manufacturer / Formulator Agreement | 2/2018-1/31/18 Membership | 1/31/2019 |
| | Western Plant Health Association | | Membership | |
| Willowood USA, LLC | American Warehousing | Rate Quotation Contract | Warehousing contract | n/a |
| Willowood USA, LLC | Helena Chemical Company - Great Fall, | Warehouse Agreement | Warehousing contract | 12/31/2021 or 30 days' notice |

5

| Entity Engaged in Contract | Vendor | Title of Contract | Description of Service | Contract Expiration |
|---|---|---|---|---|
| | MT | | | |
| Willowood USA, LLC | Helena Chemical Company - Collierville, TN | Warehouse Agreement | Warehousing contract | 30 days' notice |
| Willowood USA, LLC | Helena Chemical Company - Pasco, WA | Warehouse Agreement | Warehousing contract | 12/31/2021 or 30 days' notice |
| Willowood USA, LLC | Helena Chemical Company – Kerman, CA | Warehouse Agreement | Warehousing contract | 12/31/2012, to continue until 30 days' notice |
| Willowood USA, LLC | Intrepid Ag | Pinnacle and Willowood USA LLC Integrated Supply Chain Plan | Warehousing contract | 30 days' notice |
| Willowood USA, LLC | Lile International Companies | Master Warehouse Agreement | Warehousing contract | 30 days' notice |
| Willowood USA, LLC | Nickey Warehouses, Inc. | | Warehousing contract | n/a |
| Willowood USA, LLC | Outsource Logistics | Contract | Warehousing contract | n/a |
| Willowood USA, LLC | Pony Express Warehousing LLC | Contract and Rate Quotation | Warehousing contract | 30 days' notice |
| Willowood USA, LLC | Schirm USA Inc. | Rate Quotation/Contract | Warehousing contract | n/a |
| Willowood USA, LLC | Tri Rinse | | Warehousing contract | |
| Willowood USA, LLC | Agricultural Handler Exposure Task Force, LLC | Data Compensation Settlement and Participating Company Agreement | Task Force Agreement | n/a |
| Willowood USA, LLC | Generic Residential Exposure Task Force | | Task Force Agreement | |
| Willowood USA, LLC | Spray Drift Task Force | Confidential Unlimited-Use Data Agreement | Task Force Agreement | n/a |
| Willowood USA, LLC | Sulphur Mills | Purchase Order | Purchase order for Clomazone 3ME | n/a |
| Willowood USA, LLC | India Pesticides, Ltd. | Purchase Order | Purchase order for Thiobencarb Tech | n/a |

6

18715093.9

| Entity Engaged in Contract | Vendor | Title of Contract | Description of Service | Contract Expiration |
|---|---|---|---|---|
| Willowood USA, LLC | Dow Chemical | Purchase Order | Purchase order for Thionel | n/a |
| Willowood USA, LLC | MicroChem Corp. | Purchase Order | Sulfentrazone repack | n/a |
| Willowood USA, LLC | MicroChem Corp. | Purchase Order | Propanil 4SC production | n/a |
| Willowood USA, LLC | Schirm | Purchase Order | Clomazone repack | n/a |
| Willowood USA, LLC | MicroChem Corp. | Purchase Order | Thionil production | n/a |
| Willowood Clomazone, LLC | FMC Corporation | Supply and Data Purchase Agreement | Supply and data compensation agreement regarding Clomazone | n/a |
| Willowood USA, LLC | Source Dynamics LLC | Supply Agreement | Supply agreement for Willowood Propanil 80 DF | August 1, 2021 |

7

**Section 7(e)**
**Brokers; Agents**

1. Piper Jaffray & Co.

8

**Section 7(f)**
**Litigation**

| Title of Litigation | Description |
|---|---|
| *Demand for Payment*, Vijay Mundhra to Willowood USA, LLC, dated December 19, 2018. | Demanding payment for products delivered to Willowood USA, LLC. |
| *Heinze v. Mitchell, Coughlon, Simpson, and Willowood USA Holdings, LLC* , Case No. 2019-0018, in the Court of Chancery of the State of Delaware; *related Heinze v. Coughlon, Simpson, and Willowood USA Holdings, LLC*, Arbitration with the American Arbitration Association (No. 011900000890). | Plaintiff seeks a temporary restraining order and an injunction against the formation of a transaction committee. |
| *BASF Corp. v. Willowood LLC, Willowood USA, LLC, Willowood Ltd., Greenfields Marketing Ltd.*, Case No. 1:18-cv-268 in U.S. District Court for the District of Colorado. | BASF asserted claims against the defendants for patent infringement, and the defendants filed counterclaims against BASF for inequitable conduct, non-infringement, and patent invalidity. This matter remains pending. |
| *Syngenta Corp Protection, LLC v. Willowood, LLC, Willowood USA, LLC, Willowood Azoxystrobin, LLC, and Willowood Ltd.*, Case No. 1:15-cv-274 in the U.S. District Court for the Middle District of North Carolina and Appeal Nos. 18-1614 and 18-0244 in the U.S. Court of Appeals for the Federal Circuit. | Syngenta asserted claims against the defendants for copyright infringement, patent infringement, and unfair and deceptive trade practices under North Carolina. This appeal remains pending. |
| *In the Matter of the Arbitration Between BASF Corp. and Willowood USA, LLC, and Greenfields Marketing, Ltd.*, FIFRA Arbitration with the American Arbitration Association (No. 01-16-0000-7029) | Action to resolve amount of data compensation owed to BASF for the Pyraclostrobin technical registration. The arbitration panel entered a final judgment on or about July 6, 2018. No court has confirmed the award, and the liability remains outstanding. This matter remains pending. |

18715093.9

| Title of Litigation | Description |
|---|---|
| *Vijay Mundhra and Brian Heinze v. Willowood USA Holdings, LLC* , Case No. 18-CV-23323 in the Circuit Court of Multnomah County, Oregon. | Plaintiffs assert claims for reformation of the UPA and Declaratory Relief. Willowood USA, LLC is not a defendant but has asserted counterclaims against the plaintiffs along with Willowood USA Holdings, LLC. Those counterclaims include claims for breach of contract and declaratory judgment. This matter remains pending. |
| *Mundhra et al v. Willowood USA Holdings, LLC* , Case No. 18-cv-33725 in Denver County District Court. | This matter was initiated to issue a subpoena to Lariat Partners. Lariat has responded to the subpoena but the case remains open.  The Debtors do not anticipate any future action in this matter. |
| Petition to Cancel the Registration of Willowood, LLC's End-Use Product "Willowood Azoxystrobin 2.08SC" Containing the Active Ingredient Azoxystrobin, dated February 4, 2014, filed by Syngenta Crop Protection, LLC with the U.S. Environmental Protection Agency. | This matter remains pending and awaiting a ruling by the EPA. |

18715093.9

**Section 7(g)**
**Equity Securities**

| Transferred Subsidiary | Class and Series of Equity Securities of Transferred Subsidiary | Total Equity Securities Authorized for Issuance | Total Issued and Outstanding Equity Securities | Record and Beneficial Owners of Equity Securities and Amount of Equity Securities Owned |
|---|---|---|---|---|
| Willowood Abamectin, LLC | Units | N/A | 100 | Willowood USA – 100% |
| Willowood Glufosinate Ammonium, LLC | Units | N/A | 100 | Willowood USA– 100% |
| Willowood Oxyflurofen, LLC | Units | N/A | 100 | Willowood USA– 100% |
| Willowood Paraquat, LLC | Units | N/A | 100 | Willowood USA– 100% |
| Willowood Pronamide, LLC | Units | N/A | 100 | Willowood USA- 100% |
| Willowood Propanil, LLC | Units | N/A | 100 | Willowood USA– 100% |
| Willowood Sulfentrazone, LLC | Units | N/A | 100 | Willowood USA – 100% |

18715093.9

## Section 7(h)(i)
## Product Registrations

Registrations issued from the Environmental Protection Agency:

| Registration | Holder of the Registration | EPA Registration Number |
|---|---|---|
| Abamectin Technical | Willowood Abamectin, LLC | 89349-1 |
| Willowood Abamectin 0.15EC | Willowood, LLC | 87290-58 |
| Willowood Abamectin 0.7SC | Willowood, LLC | 87290-36 |
| Willowood Abamectin EC | Willowood, LLC | 87290-57 |
| Willowood Abamectin 0.15LV | Willowood, LLC | 87290-68 |
| Willowood Nemamectin 0.7SC | Willowoood, LLC | 87290-84 |
| RighLine Nemamectin 0.7 SC | RightLine LLC | 87290-84-93051 |
| Chlorimuron Ethyl Technical | Greenfields Marketing Ltd. | 89966-11 |
| Willowood Chlorim 25WDG | Willowood, LLC | 87290-86 |
| Clomazone Technical | Greenfields Marketing Ltd. | 89966-1 |
| Willowood Clomazone 3ME | Willowood, LLC | 87290-55 |
| Willowood Clomazone 5MEG | Willowood, LLC | 87290-46 |
| Willowood Clomazone ME | Willowood, LLC | 87290-47 |
| Cloransulam-methyl Technical | Greenfields Marketing Ltd. | 89966-9 |
| Willowood Cloransulam 84% | Willowood, LLC | 87290-87 |
| Glufosinate-Ammonium Technical | Willowood Glufosinate Ammonium, LLC | 89707-1 |

| Registration | Holder of the Registration | EPA Registration Number |
|---|---|---|
| Willowood Glufosinate 280SL | Willowood, LLC | 87290-41 |
| Imazethapyr Technical | Greenfields Marketing Ltd. | 89966-7 |
| Willowood Imazethapyr 2SL | Willowood, LLC | 87290-69 |
| Lactofen Technical | Greenfields Marketing Ltd. | 89966-8 |
| Lactofen MUP | Greenfields Marketing Ltd. | 89966-13 |
| Willowood Lactofen 2EC | Willowood, LLC | 87290-72 |
| Metribuzin Technical | Greenfields Marketing Ltd. | 89966-6 |
| Willowood Metribuzin 4SC | Willowood, LLC | 87290-80 |
| Willowood Metribuzin 75DF | Willowood, LLC | 87290-79 |
| Oxyfluorfen Technical | Willowood Oxyfluorfen, LLC | 87283-1 |
| Willowood Oxyflo 2 EC | Willowood, LLC | 87290-8 |
| Willowood Oxyflo 4 SC | Willowood, LLC | 87290-10 |
| Paraquat Technical | Willowood Paraquat, LLC | 89275-1 |
| Willowood Paraquat 3SL | Willowood, LLC | 87290-35 |
| Pronamide Technical | Willowood Pronamide, LLC | 87285-1 |
| Willowood Pronamide 3.3SC | Willowood, LLC | 87290-22 |
| Willowood Pronamide 50WSP | Willowood, LLC | 87290-3 |
| RightLine Pronamide 3.3 SC | RightLine LLC | 87290-22-93051 |
| Propanil Technical | Willowood Propanil, LLC | 87829-1 |

18715093.9

| Registration | Holder of the Registration | EPA Registration Number |
|---|---|---|
| Willowood Propanil 4EC | Willowood, LLC | 87290-32 |
| Willowood Propanil 4SC | Willowood, LLC | 87290-18 |
| Willowood Propanil 80DF | Willowood, LLC | 87290-17 |
| Sulfentrazone Technical Herbicide | Willowood Sulfentrazone, LLC | 91459-1 |
| Willowood Sulfen MTZ DF | Willowood, LLC | 87290-70 |
| Willowood Sulfen Cloran | Willowood, LLC | 87290-82 |
| Willowood Sulfen 4SC | Willowood, LLC | 87290-59 |
| Willowood Sulfentrazone 62.22%+Chlorimuron 7.78% WG | Willowood, LLC | 87290-83 |
| Willowood Sulfentrazone 33.3% + Imazethapyr 6.67% SC | Willowood, LLC | 87290-67 |
| RightLine Sulfen 4SC | RightLine LLC | 87290-59-93051 |
| Thiobencarb Technical | Greenfields Marketing Ltd. | 89966-14 |
| Willowood Thioben 8EC | Willowood, LLC | 87290-75 |
| Willowood Thionil EC | Willowood, LLC | 87290-74 |
| Willowood Thio UltraMax | Willowood, LLC | 87290-73 |

18715093.9

Table of state registrations or permits for sale of products marketed under the Willowood USA, LLC name:

| State | Abmectin 0.15LV | Abamectin 0.7SC | Chlorim 25WDG | Clomazone 3ME | Clomazone SG | Cloran DF | Glufosinate-Ammonium Tech | Glufosinate 280SL | Glufosinate 280SL (OT) | Imazethapyr 2SL | Lactofen 2EC | Metribuzin 75DF | Metriosate GT | Oxyfluorfen Tech | OxyFlo 2EC | Parquat 3SL | Pronamide 3.3SC | Pronamide 50WSP | Propanil 4EC | Propanil 4SC | Propanil 4SC (CA) | Propanil 80CHS | Propanil Tech | Sulfentrazone 4SC | Sulfentrazone Assist | Sulfentrazone MTZ DF | Thio UltraMax | Thioben BEC | Thionil EC | TOTAL | Registered | Pending (P) | Discontinuing (D) | Requested to Cancel (C) | Requested to Register (R) | Exp. Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Alabama | X | | | X | | | | | X | R | X | | | | X | X | X | | | | | | | X | | R | | | | 8 | 8 | 0 | 0 | 0 | 2 | 12/31/2020 |
| Alaska | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0 | 0 | 0 | 0 | 0 | 0 | |
| Arizona | R | D | | | | | | X | | | | | | | X | X | | | | | | | | | | | | | | 4 | 3 | 0 | 1 | 0 | 1 | 12/31/2019 |
| Arkansas | X | | | X | | X | | | X | X | X | X | | | X | X | | | X | X | | | | X | X | X | | | R | 15 | 14 | 0 | 0 | 1 | 1 | 12/31/2019 |
| California | X | X | | X | X | | X | X | | X | | | X | X | X | X | X | X | | X | X | X | | | | | | | | 15 | 15 | 0 | 0 | 0 | 0 | 12/31/2019 |
| Colorado | X | | | X | | | | X | | | | | | X | X | X | | | | | X | | | | | | | | | 7 | 7 | 0 | 0 | 0 | 0 | 12/31/2019 |
| Connecticut | | | | | | | | | | | | | | | X | | | | | | | | | | | | | | | 1 | 1 | 0 | 0 | 0 | 0 | 12/31/2021 |
| Delaware | D | | | D | | | X | D | D | | | | | X | X | | | | | | | | D | | | D | | | | 9 | 3 | 0 | 6 | 0 | 0 | 6/30/2020 |
| District of Columbia | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0 | 0 | 0 | 0 | 0 | 0 | |
| Florida | X | X | | X | | | X | X | X | | | | | X | X | X | | X | | | | X | | | | | | | | 11 | 11 | 0 | 0 | 0 | 0 | 1/31/2021 |
| Georgia | X | D | | X | | | X | X | X | X | | | | X | X | X | X | | D | | | X | X | D | X | | | | | 16 | 13 | 0 | 3 | 0 | 0 | 12/31/2019 |
| Hawaii | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0 | 0 | 0 | 0 | 0 | 0 | |
| Idaho | X | | | | | | X | X | X | | | | | X | | | | | | | | X | | X | | | | | | 7 | 7 | 0 | 0 | 0 | 0 | 12/31/2019 |
| Illinois | R | | X | X | | X | | X | X | X | X | | X | X | | | | | | | X | X | X | | | | | | | 12 | 12 | 0 | 0 | 0 | 1 | 12/31/2020 |
| Indiana | X | | X | X | | X | | X | R | X | | | X | X | | | | | | | X | X | R | | | | | | | 10 | 10 | 0 | 0 | 0 | 2 | 12/13/2019 |
| Iowa | R | | X | | | X | | X | X | X | | | X | | | | | | | | X | X | X | | | | | | | 9 | 9 | 0 | 0 | 0 | 1 | 12/31/2019 |
| Kansas | X | X | X | | | X | | X | X | | | | X | | | | | | | | X | X | X | | | | | | | 10 | 10 | 0 | 0 | 0 | 0 | 12/31/2019 |
| Kentucky | X | | D | X | | X | | X | X | X | | | X | X | | | | | | | X | X | | | | | | | | 11 | 10 | 0 | 1 | 0 | 0 | 12/31/2019 |
| Louisiana | P | | | X | | | | X | X | | | | X | | | | X | X | | | X | X | X | | | R | | | | 10 | 9 | 1 | 0 | 0 | 1 | 12/31/2019 |
| Maine | | | | | | | | | | | | | | X | | | | | | | | | | | | | | | | 3 | 1 | 0 | 0 | 2 | 0 | 12/31/2019 |
| Maryland | | | | | | | | | | | | | | X | X | | | | | | | X | | | X | | | | | 7 | 4 | 0 | 0 | 3 | 0 | 12/31/2019 |
| Massachusetts | | | | | | | | | | | | | | | X | | | | | | | | | | | | | | | 1 | 1 | 0 | 0 | 0 | 0 | 6/30/2019 |
| Michigan | X | | | X | | X | | X | X | R | X | | X | X | X | X | | | | X | X | | | X | | | | | | 13 | 12 | 0 | 0 | 1 | 1 | 6/30/2019 |
| Minnesota | | | | | | X | | X | X | X | X | | X | X | | | | | | | X | X | R | | | | | | | 10 | 8 | 0 | 0 | 2 | 2 | 12/31/2019 |
| Mississippi | X | | | X | | | | X | R | | | | | X | X | | X | X | | | X | | | | | R | | | | 9 | 8 | 0 | 0 | 1 | 2 | 12/31/2019 |
| Missouri | X | | X | X | | X | | X | X | X | | | X | X | | | X | X | | | X | X | X | | | R | | | | 14 | 14 | 0 | 0 | 0 | 1 | 12/31/2019 |
| Montana | | | | | | | | X | X | | | | | X | | | | | | | X | X | | | | | | | | 5 | 5 | 0 | 0 | 0 | 0 | 12/31/2019 |
| Nebraska | | | X | X | | X | | X | X | X | | P | | X | X | | | | | | X | X | X | | | | | | | 12 | 11 | 1 | 0 | 0 | 0 | 12/31/2019 |
| Nevada | | | | | | | | X | | | | | | X | X | | | | | | X | | | | | | | | | 4 | 4 | 0 | 0 | 0 | 0 | 12/31/2019 |
| New Hampshire | | | | | | | | | | | | | | X | | | | | | | | | | | | | | | | 1 | 1 | 0 | 0 | 0 | 0 | 12/31/2019 |
| New Jersey | | | | | | | X | | D | | | | | X | | | | | | | | | D | | | | | | | 4 | 2 | 0 | 2 | 0 | 0 | 12/31/2019 |
| New Mexico | X | | | | | | | X | X | | | | | X | | | | | | | X | | | | | | | | | 5 | 5 | 0 | 0 | 0 | 0 | 12/31/2019 |
| New York | | | | | | | | | | | | | | X | | | | | | | | | | | | | | | | 3 | 1 | 0 | 0 | 2 | 0 | 3/31/2020 |
| North Carolina | X | | | X | | | X | X | | | | | X | X | X | | | | | X | X | X | | | | | | | | 11 | 11 | 0 | 0 | 0 | 0 | 12/31/2019 |
| North Dakota | | | | X | | | | X | X | R | | | | X | | | | | | | X | X | X | | | | | | | 7 | 7 | 0 | 0 | 0 | 1 | 12/31/2019 |
| Ohio | | | X | | | X | | X | X | X | | | | X | | | | | | | X | X | X | | | | | | | 9 | 9 | 0 | 0 | 0 | 0 | 6/30/2019 |
| Oklahoma | X | D | | D | | | | X | X | | | | | X | | | | | | | X | X | X | | | | | | | 9 | 7 | 0 | 2 | 0 | 0 | 12/31/2019 |
| Oregon | X | | | | | | X | | | | | | | X | X | X | X | | | | X | | | | | | | | | 8 | 7 | 0 | 0 | 1 | 0 | 12/31/2019 |
| Pennsylvania | | | | | | R | | | | R | | | | X | X | | | | | | X | R | | | | | | | | 3 | 3 | 0 | 0 | 0 | 3 | 12/31/2019 |
| Puerto Rico | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0 | 0 | 0 | 0 | 0 | 0 | |
| Rhode Island | | | | | | | | | | | | | | X | | | | | | | | | | | | | | | | 1 | 1 | 0 | 0 | 0 | 0 | 11/30/2019 |
| South Carolina | X | | | X | | | | X | X | | | | | X | X | X | | | | | X | X | X | | | | | | | 11 | 10 | 0 | 0 | 1 | 0 | 8/31/2019 |
| South Dakota | | | X | | | X | | X | X | | | | | X | | | | | | | X | X | X | | | | | | | 8 | 8 | 0 | 0 | 0 | 0 | 6/30/2020 |
| Tennessee | X | | | X | | X | | X | X | X | | | | X | X | X | | | | | X | X | X | | | | | | | 13 | 12 | 0 | 0 | 1 | 0 | 7/31/2019 |
| Texas | X | | | X | | | | X | X | | | | | X | X | X | | X | X | | | X | X | X | | | R | | | 12 | 12 | 0 | 0 | 0 | 1 | 12/31/2019 |
| Utah | | | | | | | | | X | | | | | X | | | | | | | X | | | | | | | | | 4 | 3 | 0 | 0 | 1 | 0 | |
| Vermont | | | | | | | | | | | | | | X | | | | | | | X | | | | | | | | | 2 | 1 | 0 | 0 | 1 | 0 | 11/30/2019 |
| Virginia | X | D | | X | | | | X | X | | | | | X | X | X | | | | | X | | | | | | | | | 10 | 7 | 0 | 1 | 2 | 0 | 12/31/2019 |
| Washington | X | | | | | | | | | | | | | X | X | X | X | | | | X | | | | | | | | | 9 | 6 | 0 | 0 | 3 | 0 | 12/31/2019 |
| West Virginia | X | | | X | | | | X | X | | | | | X | X | | | | | | X | | | | | | | | | 9 | 7 | 0 | 0 | 2 | 0 | 12/31/2019 |
| Wisconsin | | | | X | | P | | X | X | | | | | X | | | | | | | X | | | | | | | | | 9 | 5 | 1 | 0 | 3 | 0 | 12/31/2019 |
| Wyoming | | | | | | | | | | | | | | X | | | | | | | | | | | | | | | | 1 | 1 | 0 | 0 | 0 | 0 | 12/31/2019 |
| **TOTAL** | 28 | 12 | 12 | 24 | 1 | 16 | 1 | 10 | 34 | 33 | 13 | 3 | 1 | 1 | 24 | 48 | 15 | 5 | 6 | 7 | 1 | 1 | 1 | 37 | 24 | 24 | 0 | 0 | 0 | | | | | | | |
| Registered | 23 | 3 | 8 | 21 | 1 | 15 | 1 | 10 | 29 | 27 | 13 | 3 | 0 | 1 | 24 | 48 | 15 | 5 | 6 | 6 | 1 | 1 | 1 | 36 | 20 | 18 | 0 | 0 | 0 | | | | | | | |
| Pending (P) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | | | | |
| Discontinuing (D) | 1 | 4 | 1 | 2 | 0 | 0 | 0 | 0 | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | | | | | | | |
| Requested to Cancel (C) | 3 | 5 | 3 | 1 | 0 | 0 | 0 | 0 | 4 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 4 | 0 | 0 | 0 | | | | | | | |
| Requested to Register (R) | 3 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 5 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 3 | 0 | 0 | 5 | | | | | | | |

15

Table of state registrations or permits for sale of products marketed under the RightLine LLC name:

| | NEMAMECTIN 0.7 SC | PRONAMIDE 3.3 SC | SULFEN 4 SC | TOTAL | Registered | Pending | Discontinuing | Requested to Cancel | Requested to Register | Exp. Date |
|---|---|---|---|---|---|---|---|---|---|---|
| Alabama | X | X | X | 3 | 3 | 0 | 0 | 0 | 0 | 12/31/2020 |
| Alaska | | | | 0 | 0 | 0 | 0 | 0 | 0 | |
| Arizona | | | | 0 | 0 | 0 | 0 | 0 | 0 | 12/31/2019 |
| Arkansas | X | X | X | 3 | 3 | 0 | 0 | 0 | 0 | 12/31/2019 |
| California | | | | 0 | 0 | 0 | 0 | 0 | 0 | 12/31/2019 |
| Colorado | | | | 0 | 0 | 0 | 0 | 0 | 0 | 12/31/2019 |
| Connecticut | P | | | 1 | 0 | 1 | 0 | 0 | 0 | 12/31/2021 |
| Delaware | | | X | 1 | 1 | 0 | 0 | 0 | 0 | 6/30/2019 |
| District of Columbia | X | | X | 2 | 2 | 0 | 0 | 0 | 0 | 1/31/2020 |
| Florida | X | X | X | 3 | 3 | 0 | 0 | 0 | 0 | 1/31/2021 |
| Georgia | X | X | X | 3 | 3 | 0 | 0 | 0 | 0 | 12/31/2019 |
| Hawaii | | | | 0 | 0 | 0 | 0 | 0 | 0 | |
| Idaho | | | X | 1 | 1 | 0 | 0 | 0 | 0 | 12/31/2019 |
| Illinois | | | X | 1 | 1 | 0 | 0 | 0 | 0 | 12/31/2020 |
| Indiana | | | X | 1 | 1 | 0 | 0 | 0 | 0 | 12/13/2019 |
| Iowa | | | X | 1 | 1 | 0 | 0 | 0 | 0 | 12/31/2019 |
| Kansas | | | X | 1 | 1 | 0 | 0 | 0 | 0 | 12/31/2019 |
| Kentucky | X | | X | 2 | 2 | 0 | 0 | 0 | 0 | 12/31/2019 |
| Louisiana | X | | X | 2 | 2 | 0 | 0 | 0 | 0 | 12/31/2019 |
| Maine | | | | 0 | 0 | 0 | 0 | 0 | 0 | 12/31/2019 |
| Maryland | | | X | 1 | 1 | 0 | 0 | 0 | 0 | 12/31/2019 |
| Massachusetts | | | X | 1 | 1 | 0 | 0 | 0 | 0 | 6/30/2019 |
| Michigan | | | X | 1 | 1 | 0 | 0 | 0 | 0 | 6/30/2019 |
| Minnesota | | | X | 1 | 1 | 0 | 0 | 0 | 0 | 12/31/2019 |
| Mississippi | X | X | X | 3 | 3 | 0 | 0 | 0 | 0 | 12/31/2019 |
| Missouri | X | | X | 2 | 2 | 0 | 0 | 0 | 0 | 12/31/2019 |
| Montana | | | | 0 | 0 | 0 | 0 | 0 | 0 | 12/31/2019 |
| Nebraska | | | | 0 | 0 | 0 | 0 | 0 | 0 | 12/31/2019 |
| Nevada | | | X | 1 | 1 | 0 | 0 | 0 | 0 | 12/31/2019 |
| New Hampshire | | | | 0 | 0 | 0 | 0 | 0 | 0 | 12/31/2019 |
| New Jersey | R | | X | 1 | 1 | 0 | 0 | 0 | 1 | 12/31/2019 |
| New Mexico | X | | | 1 | 1 | 0 | 0 | 0 | 0 | 12/31/2019 |
| New York | | | | 0 | 0 | 0 | 0 | 0 | 0 | 3/31/2019 |
| North Carolina | X | X | X | 3 | 3 | 0 | 0 | 0 | 0 | 12/31/2019 |
| North Dakota | | | | 0 | 0 | 0 | 0 | 0 | 0 | 12/31/2019 |
| Ohio | X | | X | 2 | 2 | 0 | 0 | 0 | 0 | 6/30/2019 |
| Oklahoma | R | | X | 1 | 1 | 0 | 0 | 0 | 1 | 12/31/2019 |
| Oregon | | | R | 0 | 0 | 0 | 0 | 0 | 1 | 12/31/2019 |
| Pennsylvania | X | | X | 2 | 2 | 0 | 0 | 0 | 0 | 12/31/2019 |
| Puerto Rico | | | | 0 | 0 | 0 | 0 | 0 | 0 | |
| Rhode Island | | | | 0 | 0 | 0 | 0 | 0 | 0 | 11/30/2019 |
| South Carolina | X | X | X | 3 | 3 | 0 | 0 | 0 | 0 | 8/31/2019 |
| South Dakota | | | | 0 | 0 | 0 | 0 | 0 | 0 | 6/30/2020 |
| Tennessee | X | | X | 2 | 2 | 0 | 0 | 0 | 0 | 7/31/2019 |
| Texas | R | X | X | 2 | 2 | 0 | 0 | 0 | 1 | 12/31/2019 |
| Utah | | | X | 1 | 1 | 0 | 0 | 0 | 0 | 5/31/2019 |
| Vermont | | | | 0 | 0 | 0 | 0 | 0 | 0 | 11/30/2019 |
| Virginia | R | X | X | 2 | 2 | 0 | 0 | 0 | 1 | 12/31/2019 |
| Washington | | | X | 1 | 1 | 0 | 0 | 0 | 0 | 12/31/2020 |
| West Virginia | R | | X | 1 | 1 | 0 | 0 | 0 | 0 | 12/31/2019 |
| Wisconsin | | | X | 1 | 1 | 0 | 0 | 0 | 0 | 12/31/2019 |
| Wyoming | | | | 0 | 0 | 0 | 0 | 0 | 0 | 12/31/2019 |

| | | | |
|---|---|---|---|
| TOTAL | 16 | 9 | 33 |
| Registered | 15 | 9 | 33 |
| Pending | 1 | 0 | 0 |
| Discontinuing | 0 | 0 | 0 |
| Requested to Cancel | 0 | 0 | 0 |
| Requested to Register | 5 | 0 | 1 |

16

18715093.9

| Product | Unelss Specified, Holder of Outstanding State Permits | In Georgia | In Mississippi | In New Jersey |
|---|---|---|---|---|
| RightLine NEMAMECTIN 0.7 SC | RightLine LLC | RightLine LLC | Willowood, LLC | |
| RightLine PRONAMIDE 3.3 SC | RightLine LLC | RightLine LLC | Willowood, LLC | |
| RightLine SULFEN 4 SC | RightLine LLC | RightLine LLC | Willowood, LLC | Willowood, LLC |
| Abmectin 0.15LV | Willowood, LLC | Willowood, LLC | Willowood, LLC | |
| Abamectin 0.7SC | Willowood, LLC | Willowood, LLC | | |
| Chlorim 25WDG | Willowood, LLC | | | |
| Clomazone 3ME | Willowood, LLC | Willowood, LLC | Willowood, LLC | |
| Clomazone 5G | Willowood, LLC | | | |
| Cloran DF | Willowood, LLC | | | |
| Glufosinate-Ammonium Tech | Willowood Glufosinate Ammonium, LLC | | | |
| Glufosinate 280SL | Willowood, LLC | Willowood, LLC | | Willowood, LLC |
| Glufosinate 280SL (OT) | Willowood, LLC | Willowood, LLC | Willowood, LLC | |
| Imazethapyr 2SL | Willowood, LLC | Willowood, LLC | | Willowood, LLC |
| Lactofen 2EC | Willowood, LLC | Willowood, LLC | | |
| Metribuzin 75DF | Willowood, LLC | | | |
| Oxyfluorfen Tech | Willowood Oxyfluorfen, LLC | | | |
| OxyFlo 2EC | Willowood, LLC | Willowood, LLC | | |
| Parquat 3SL | Willowood, LLC | Willowood, LLC | Willowood, LLC | Willowood, LLC |
| Pronamide 3.3SC | Willowood, LLC | Willowood, LLC | Willowood, LLC | |
| Pronamide 50WSP | Willowood, LLC | Willowood, LLC | | |
| Propanil 4EC | Willowood, LLC | | Willowood, LLC | |
| Propanil 4SC | Willowood, LLC | Willowood, LLC | Willowood, LLC | |
| Propanil 4SC (CA) | Willowood, LLC | | | |
| Propanil 80CHS | Willowood, LLC | | | |
| Propanil Tech | Willowood Propanil, LLC | Willowood, LLC | | |
| Sulfentrazone 4SC | Willowood, LLC | Willowood, LLC | Willowood, LLC | |
| Sulfentrazone Assist | Willowood, LLC | Willowood, LLC | Willowood, LLC | |
| Sulfentrazone MTZ DF | Willowood, LLC | Willowood, LLC | | Willowood, LLC |
| Thio UltraMax | Willowood, LLC | | | |
| Thioben 8EC | Willowood, LLC | | | |
| Thionil EC | Willowood, LLC | | Willowood, LLC - Registration Pending | |

## Section 7(h)(ii)
**Notice of Expiration or Termination of Product Registrations**

1. None.

<u>**EXHIBIT A**</u>

**ASSIGNMENT AND ASSUMPTION AGREEMENT**

## EXHIBIT B

**BID PROCEDURES ORDER**